802 So.2d 1224 (2001)
STATE of Louisiana
v.
Clifford DERUISE.
No. 98-KA-0541.
Supreme Court of Louisiana.
April 3, 2001.
Rehearing Denied April 27, 2001.
*1228 Marcia A. Widder, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Valentin M. Solino, Susan E. Talbot, Counsel for Respondent.
KIMBALL, Judge.
This is a direct appeal from a conviction of first degree murder and a sentence of death on two counts. La. Const. art. V, *1229 § 5(D). The defendant's appeal is based on a total of twenty-seven assignments of error.[1] We find that none of the defendant's arguments concerning the guilt or penalty phase of his trial for Etienne Nachampassak's murder constitute reversible error; therefore, on that count the defendant's conviction and sentence are affirmed. However, while none of the defendant's arguments with respect to the guilt phase for Gary Booker's murder constitute reversible error, we find that the evidence was insufficient to support the jury's finding during the penalty phase that Gary Booker was killed in an especially heinous and cruel manner. Therefore, because the jury only returned the one invalid aggravating factor of heinousness on that count, the case is remanded for a new penalty hearing on the Gary Booker murder.

PROCEDURAL HISTORY
On January 4, 1996, an Orleans Parish grand jury indicted the defendant, Clifford Deruise, for two counts of first degree murder. A jury later found the defendant guilty as charged and unanimously recommended a sentence of death for both counts. With respect to the first count, involving the murder of Gary Booker, the jury found the sole aggravating circumstance of heinousness. La.Code Crim. Proc. art. 905.4(A)(7). On the second count for the murder of Etienne Nachampassak, the jury returned four aggravating circumstances: (1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; (2) the offender knowingly created a risk of death or great bodily harm to more than one person; (3) the offense was committed in an especially heinous, atrocious, or cruel manner; and (4) the victim was under the age of twelve years. La.Code Crim. Proc. art. 905.4(A)(1), (4), (7), (10). The defendant now directly appeals his conviction and sentence to this court. La. Const. art. V, § 5(D).

FACTS
At approximately 4:30 p.m. on November 4, 1995, Gary Booker and two of his friends, Kevin Bryant and Cedric Kelly, were walking through the St. Thomas Housing Project in the 600 block of St. Mary Drive. According to Bryant's and Kelly's trial testimony, the defendant, Clifford Deruise, approached the men and asked for a dollar. Kelly testified that, when the three men refused to give the defendant a dollar, telling him they had no money, the defendant lifted his shirt and showed them a .22 caliber revolver. According to Kelly, the defendant again asked for a dollar, stating, "Man, I've got a gun. Ya'll still ain't gonna give me a dollar?". The three men again refused and began to walk away. Bryant testified that he broke from the group and walked over towards a girl who had called his name. Kelly testified that he and Gary had broken into a run, with him ahead of Gary, when he heard gunshots. He stated that he turned around and saw Gary lying on the ground with the defendant standing over him and firing a gun into his body. Kelly claimed that the defendant went through the victim's pocket and remarked that he had "asked the bitch-ass nigger nice," before running off. Bryant stated that when he heard the gunshots, he dropped to the ground and turned his head to see the defendant from behind as he fled the scene. Gary Booker died from *1230 eight gunshot wounds to his side and back. Both witnesses later identified the defendant as the perpetrator from a photographic lineup, and both made an in-court identification of the defendant at trial.
Two days after Gary Booker was killed, on November 6, 1996, Danna and Vorana Nachampassak and their two children, eleven-month-old Etienne and two-year-old Vinaya, were leaving their house at 1016 First Street to have their family portrait taken. While Vorana Nachampassak was securing Etienne in the backseat of their car, Danna, who had already placed Vinaya in her carseat, got in the driver's seat by entering through the passenger side door, because the driver's side door was broken. As she was getting in the car, she noticed a man walking towards them, who was staring at her with what she considered an angry expression. Danna, feeling nervous as she watched the man approach, started the car while her husband was still buckling Etienne in his carseat. When the man neared the car, he covered his face with a white and black bandana. He stood at the open passenger side door and pointed a gun at Danna ordering her to get out of the car. Both Vorana and Danna tried to explain that the driver's side door was broken and she would have to get out the passenger side, which the gunman was blocking. Both also begged the man not to hurt their children. The gunman again demanded that Danna get out, but Danna remained in the car out of her desire to protect her children. The man reached inside the car for Danna's purse, but dropped it next to the car. Danna took the opportunity to accelerate quickly to get her children away from the scene. As she drove off, she heard gunfire and felt four bullets hit her body.
Vorana stated that when Danna drove off, the gunman took off after the car, shooting at it. Vorana chased the man and tackled him from behind, punching the man in his right ear and causing the man to scrape his shoulder as he hit the ground. After a struggle, Vorana managed to wrestle the gun away from the man, and the man took off running. Vorana ran after the man and attempted to fire the weapon at him, but the gun was empty. However, Vorana got worried when he heard the man yell "help" and then noticed a second man, also dressed in all black, coming towards them.[2] Vorana gave up the pursuit and put the gun in his wife's purse, which he hung on a nearby fence.
In the meantime, Danna had attempted to drive straight up First Street, but claimed the street was blocked by the second man dressed in black. She drove around the block and came to a stop on Second Street. When she turned and saw that Etienne had been hit by a bullet and was profusely bleeding, she began to scream and asked bystanders for help. A bystander called 911, and police officers arrived shortly thereafter and immediately drove Etienne to Children's Hospital. Danna was transported to Charity Hospital by ambulance. Following emergency surgery and a drug-induced coma, Etienne died two days later from a gunshot wound to his head.
Back near the scene of the crime, police officers cruising the area spotted a man fitting the gunman's description running through the St. Thomas Housing Project *1231 in a pair of cut-off long johns and a t-shirt. The man, Clifford Deruise, appeared to be discarding articles of dark clothing. Two officers subsequently discovered the defendant in an apartment, hiding under a kitchen table, clad only in the cut-off long johns and t-shirt. The arresting officers noticed that the defendant had a cut on his shoulder and a red mark on his face. Danna identified the defendant that same day from a photographic lineup and also made an in-court identification at trial. Ballistics tests proved that bullets recovered from Gary Booker and Etienne Nachampassak were fired from the same .22 caliber revolver, which was recovered by Vorana Nachampassak at the scene of the crime.

LAW AND DISCUSSION

Motion to Sever Counts
In assignments of error 1-2, the defendant contends that the trial court erred by denying his motion to sever the trial of the two offenses. Louisiana Code of Criminal Procedure art. 493 (Joinder of offenses) provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
The offenses, in this case, were properly joined pursuant to Article 493. Although the crimes involved two different victims, the offenses were perpetrated on each victim within a relatively short time span, in the same area of town, and with the same weapon, making them similar enough to permit joinder. Further, as the defendant was charged with first degree murder for both offenses, the counts were triable by the same mode of trial. See State v. Brooks, 541 So.2d 801, 804 (La.1989) (finding that the offenses charged, two counts of first degree murder, were properly joined because the counts were of the same character, the penalty for each offense was either death or life imprisonment, and each required the same mode of trial, a jury of twelve jurors, all of whom must concur in order for a sentence of death to be imposed).
However, even when multiple offenses may be joined under Article 493, La.Code Crim. Proc. art. 495.1 additionally provides that:
If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.
The defendant argues that the trial court's refusal to sever the counts in this case precluded him from receiving due process and a fair trial. He further argues that the prosecution only joined the two unrelated homicides in order to bolster its weak evidence on both counts and to prejudice the defendant, pointing out that the Gary Booker murder was sadly unremarkable on its facts, but that the Etienne Nachampassak murder was highly publicized, sensational, and inflammatory. By permitting the offenses to be tried together, the defendant claims that the trial court allowed the Gary Booker charge to get swept up in the surge of inflammatory *1232 emotions that naturally accompanied the jury's consideration of an infant's death during a random act of violence. The defendant points to the jury's inconsistent verdicts on the Gary Booker charge in the guilt and penalty phases of the case[3] as demonstrating that the joinder of the offenses actually precluded the defendant from receiving a fair trial on either charge.
A motion to sever is addressed to the sound discretion of the trial court, and the court's ruling should not be disturbed on appeal absent a showing of an abuse of discretion. Brooks, 541 So.2d at 804 (citing State v. Williams, 418 So.2d 562, 564 (La.1982)). In ruling on such a motion, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. Id. (quoting State v. Washington, 386 So.2d 1368, 1371 (La.1980)). However, the fact that evidence of one of the charges would not be admissible under State v. Prieur, 277 So.2d 126 (La.1973), in a separate trial on the joined offense, does not per se prevent the joinder and single trial of both crimes, if the joinder is otherwise permissible. State v. Davis, 92-1623, p. 9 (La.5/23/94), 637 So.2d 1012, 1019 (citing State v. Celestine, 452 So.2d 676 (1984)). Finally, there is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. Brooks, 541 So.2d at 805.
While the two charges in the present case share enough similarities to make joinder permissible, the facts of each offense are not identical and are easily distinguishable from each other. Furthermore, during voir dire, the prosecution and the defense referred to the charges as separate offenses and stressed to the potential jurors the importance of considering the charges independently. More important is that the evidence against the defendant on each count was not complex and was presented in an orderly fashion, allowing the jury to segregate the charges and evidence. All of the witnesses, with the exception of Officer Treadaway, the prosecution's firearm expert, testified exclusively to either the murder of Gary Booker or that of Etienne Nachampassak. Only Officer Treadaway testified regarding both offenses, stating that the same gun was used in both murders. Additionally, both the prosecution and the defense compartmentalized their opening and closing statements according to the separate counts. In fact, over the prosecutor's objection, the trial court allowed both defense attorneys to participate in closing arguments, with each one arguing a separate count. The trial judge also specifically instructed the jury that it was to consider *1233 the two counts separately and was to render a verdict as to each count independently of the other.
Finally, as to the defendant's argument regarding the prejudice he suffered as to both counts due to the community outrage and wide-spread publicity surrounding the murder of Etienne Nachampassak, we do not find that the defendant has demonstrated that he was prejudiced. See State v. Strickland, 94-0025, pp. 13-14 (La.11/1/96), 683 So.2d 218, 226 (holding that harmless error standard of review applies to a prejudicial joinder claim on appeal and reviewing court should not reverse unless the error affected the substantial rights of the defendant at trial). Contrary to the defendant's argument that the jury's inconsistent penalty verdict in the Gary Booker case demonstrates prejudice, the fact that the jury returned armed robbery as an aggravating factor in the Etienne Nachampassak penalty verdict and did not in the Gary Booker verdict, suggests that the jury properly considered the two charges separately from one another. Because we do not find that the defendant has shown that he was prejudiced by the joinder of the two murder charges, the trial court's denial of the motion to sever does not constitute reversible error.

Voir Dire
The defendant complains in assignment of error no. 4 of the manner in which the trial judge conducted the death-qualification of jurors during voir dire. A review of the record indicates that the trial court initially questioned the prospective jurors about the death penalty in five separate panels consisting of eighteen jurors. At the conclusion of the court's questioning of each panel, the court excused jurors whose responses appeared to render them incompetent and invited feedback from the prosecution and defense. However, the attorneys were not allowed to ask the jurors any questions during this portion of the proceedings.[4] The defendant now argues that the death qualification process conducted solely by the trial court precluded the defense from rehabilitating any of the forty prospective jurors who were excused for cause based on their difficulty in considering the death penalty, and that the court's actions resulted in a death-prone jury.
The record reveals that defense counsel made no objection during voir dire examination either to the manner of questioning the prospective jurors or to the excuse of the jurors challenged for their views with respect to the death penalty. In fact, when the prosecutor subsequently attempted to question a potential juror about the death penalty, defense counsel objected on the grounds that the court had already conducted that line of questioning. In any event, this court has held that a defendant waives review of irregularities in the selection of the jury when no objection is lodged in a timely manner. See State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369 (holding that the contemporaneous objection rule contained in La.Code Crim. Proc. article 841 applies to the guilt phase in capital cases); State v. Frost, 97-1771, p. 3, n. 4 (La.12/1/98), 727 So.2d 417, 422 (extending Taylor to voir dire errors defaulted by lack of objection). Accordingly, this assignment is without merit.

Incomplete Record / Challenge for Cause
In his third assignment of error, the defendant argues that the incomplete appellate *1234 record is insufficient to enable appellate counsel and this court to review the proceedings for error. The defendant complains that approximately fifty-seven bench conferences took place off the record, many of which allegedly addressed matters critical to an adequate review of the proceedings below. The defendant contends that the deficiencies in the record of voir dire most clearly demonstrate the inadequacy of the record as a whole.
Both this court and the United States Supreme Court have made clear that a criminal defendant has a right to a complete transcript of the trial proceedings, particularly, where as here, appellate counsel was not counsel at trial. See Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964); State v. Robinson, 387 So.2d 1143 (La.1980). Further, in Louisiana, a defendant is constitutionally guaranteed the right of appeal "based upon a complete record of all the evidence upon which the judgment is based." La. Const. art. I, § 19. Thus, material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. See State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214 (finding appellate record so deficient that the court could not properly review the case for error); Robinson, supra (holding that reversal required when record failed to contain the testimony of a state and defense expert witness); State v. Ford, 338 So.2d 107 (La.1976) (determining that reversal required when record was missing the testimony of four state witnesses and the voir dire of prospective jurors).
On the other hand, inconsequential omissions or slight inaccuracies do not require reversal, as an incomplete record may nonetheless be adequate for appellate review. See State v. Castleberry, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773; State v. Hawkins, 96-0766, p. 8 (La.1/14/97), 688 So.2d 473, 480; State v. Allen, 95-1754, p. 11 (La.9/5/96), 682 So.2d 713, 722. Finally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. Castleberry, supra (holding that the defendant failed to show any prejudice resulting from bench conferences not being transcribed and, therefore, there was no reversible error); Allen, supra (finding that defendant was not prejudiced by failure of court reporter to record attorney's arguments concerning some of their peremptory challenges which were made during bench conferences).
In the instant case, the defendant complains primarily of the transcription of voir dire proceedings. Specifically, the defendant complains that the court reporter did not identify prospective jurors by name as they responded to questions during voir dire and further failed to record bench conferences in which peremptory strikes and challenges for cause were made by the prosecutor and defense counsel. As an initial matter, we note that during the death qualification process, the trial court did identify each juror by name. However, during the general voir dire examination, the court reporter designated each venire person by the term "PROSPECTIVE JUROR," instead of by each individual's name. Even so, a review of the transcript reveals that the court reporter's omission does not render it impossible to determine the identity of the juror speaking, given that the attorneys referred to most of the prospective jurors by name during their questioning.
While it is true that there is no record of the bench conferences during *1235 which the prosecutor and defense made their peremptory and cause challenges, the defendant only points to one potential juror whom he believes should have been struck for cause. The defendant asserts that it is likely that the trial court erroneously denied a challenge for cause of prospective juror, Gerard Kreider, who was employed as a New Orleans Police Lieutenant at the time. The jury strike sheet indicates that the defense exercised its fifth peremptory challenge against Mr. Kreider, but does not indicate whether a challenge for cause was made first. Arguably, defense counsel may have unsuccessfully challenged Mr. Kreider for cause and then been forced to exercise a peremptory challenge to excuse him. In support of this claim, appellate counsel attaches an affidavit to her brief signed by Robert Jenkins, lead trial counsel for the defense, stating that, "it is [his] uniform practice to seek removal for cause of any actively employed law enforcement officer." However, Mr. Jenkins conceded that he has no specific recollection as to whether he challenged Mr. Kreider for cause in this case.
Even assuming the defense unsuccessfully challenged Mr. Kreider for cause, the trial court's denial of that challenge would not have constituted reversible error. In State v. Ballard, 98-2198 (La.10/19/99), 747 So.2d 1077, this court overruled State v. Simmons, 390 So.2d 1317 (La.1980), and held that Louisiana courts should no longer presume that police officers actively engaged in law enforcement are incompetent criminal jurors. Further, a trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion if the juror demonstrates that he or she is willing and able to decide the case impartially and according to the law. State v. Cross, 93-1189, p. 8 (La.6/30/95), 658 So.2d 683, 687; State v. Robertson, 92-2660, p. 4 (La.1/14/94), 630 So.2d 1278, 1281.
The following portion of voir dire involving Mr. Kreider demonstrates that the trial judge did not abuse his discretion, if he, in fact, determined that Mr. Kreider was able to act impartially as a juror on this case:
STATE: And would the fact that your are a police officer ... cause you to lean towards the State in this case?
JUROR: Absolutely not.
* * * *
STATE: Okay. The fact that you know these officers, would that cause you to give them any more credibility than any other witness when they take they stand?
JUROR: No.
* * * *
DEFENSE: Do you think or do you believe that just because a police officer is going to sit here, he's going to tell the truth?
JUROR: No.
DEFENSE: And you are familiar with Detective Marco Demma; is that correct?
JUROR: I know him. I wouldn't say "friends" but I know him from being on the job.
DEFENSE: Okay. And what about Richard Leblanc?
JUROR: No. I know him.
DEFENSE: Gerald Kuhn. Do you know those
JUROR: I know the names.

*1236 DEFENSE: All right. And let's say that you came back and you sat on this jury and there was a not guilty verdict. Would you have any problems with that or going back to work as a police officer?
JUROR: No.
DEFENSE: And you can be fair and impartial?
JUROR: Absolutely.
Additionally, Mr. Kreider indicated that he could consider mitigating evidence at the penalty phase and that, with respect to the elements needed for an identification, he would have to consider the witnesses' description of the perpetrator's clothing, height, weight, and the time frame in which the witnesses viewed the perpetrator. If anything, voir dire reveals that Mr. Kreider most likely could have acted as an impartial and well-informed juror. We also note that another prospective juror, Mr. Flot, was excused for cause based on his employment as a New Orleans Police Officer, thereby indicating that the trial court was willing to excuse police officers for cause when it was necessary in order to empanel a fair jury.
Regarding the defendant's argument that the record is insufficient for this court to make a meaningful review because the bench conferences were not transcribed, upon a review of the record, we find this claim likewise to be without merit. Louisiana Code Crim. Proc. art. 843 provides:
In felony cases, and on motion of the court, the State, or the defendant in misdemeanor cases tried in a district, parish, or city court, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. State v. Hoffman, 98-3118, p. (La.4/11/00), 768 So.2d 542, 586. However, in Hoffman, we interpreted Article 843's requirement that "objections" and "arguments" be recorded as normally applying only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke Article 843. Id. We further determined in that case that, similarly, Art. I., § 19's mandate that "evidence" be recorded does not encompass bench conferences; at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843. Id. at 587.
While the defendant points to several different bench conferences that occurred off-the-record, primarily involving evidentiary matters, we first note that many of those matters were preserved for review, because defense counsel lodged objections on the record at trial, and have been raised on appeal. As for the remainder of the unrecorded bench conferences, the defendant has not demonstrated any specific prejudice which he suffered as a result of those conferences not being transcribed; nor does anything in the record suggest that the conferences had a discernible impact on the proceedings. See Hoffman, 768 So.2d at 587 (finding that where defendant could point to no specific prejudice, the failure to record bench conferences did not constitute reversible error); Castleberry, 758 So.2d at 772-73 *1237 (stating that absence from the record of four unrecorded bench conferences did not deny defendant effective appellate review); State v. Brumfield, 96-2667, pp. 14-16 (La.10/28/98), 737 So.2d 660, 669-670 (holding that the trial court's failure to have each bench conference and ruling properly transcribed was not reversible error when the defendant failed to show that he was prevented from presenting any relevant evidence and failed to establish that any prejudice resulted from the absence in the record.)[5]

Prosecutorial Misconduct / Brady Violations
In these assignments of error, the defendant argues that his conviction and death sentence should be reversed because of prosecutorial misconduct.

A. Brady Violations
First, the defendant contends that the prosecutors suppressed exculpatory and impeachment material in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendant points to the prosecutor's failure to disclose (1) Danna Nachampassak's taped statement, which he alleges contradicts her trial testimony on critical issues regarding her identification; (2) Detective Demma's supplemental police report which states that Troy Roberts was unable to identify the defendant as the shooter when he viewed him through a one-way mirror at the police station; (3) any reports or statements regarding Eric Jagneaux's identification of the defendant; and (4) descriptions given at the time of the crime of the shooter and his clothing, which did not match the sweatshirt introduced into evidence.
In Brady, the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. 373 U.S. at 87, 83 S.Ct. at 1196-1197. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972); State v. Knapper, 579 So.2d 956, 959 (La.1991). Still, Brady and its progeny do not establish a general rule of discoverability. A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).
For purposes of Brady's due process rule, a reviewing court determining materiality must ascertain not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) *1238 (citing Bagley, 473 U.S. at 678, 105 S.Ct. at 3381); Strickland, 683 So.2d at 234 (citing State v. Marshall, 94-0461, p. 14 (La.9/5/95), 660 So.2d 819, 825). Thus, the reviewing court does not apply an out-come-determinative test; rather, a Brady violation occurs when the court finds that the "evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
First, the defendant argues that the prosecutor's failure to disclose Danna Nachampassak's taped statement violated his due process rights because it denied him the ability to impeach her identification. Specifically, the defendant asserts that her taped statement contradicts her trial testimony on critical issues such as her view of the shooter, her identification of the hooded sweatshirt allegedly worn by the shooter, and whether she intended to drive on the day of the shooting. However, a fair comparison of Danna's statement with her trial testimony reveals little difference between the two narratives. Only minor discrepancies are detectable, such as Danna's pretrial statement that she was still outside the car when she saw the gunman approaching as compared to her testimony at trial that she was in the process of getting in the car when she first saw him. The defendant also points to the inconsistency of Danna's identification of the perpetrator's clothing, pointing out that in her pretrial statement, she described the clothing as jeans and a t-shirt, but that during direct examination, she indicated that the shooter wore dark clothing, dark jeans, and a long sleeved shirt. However, the differences complained of by the defendant do not constitute significant inconsistencies nor undermine the reliability of her testimony. Moreover, defense counsel cross-examined Danna at trial concerning the reliability of her identification, her description of the perpetrator's clothing, and her narrative of the events on the day of the shooting. Thus, we find that the discrepancies the defendant points to do not undermine confidence in the verdict. Kyles, 514 U.S. at 434, 115 S.Ct. at 1566.
Next, the defendant maintains that the supplemental police report prepared by Detective Demma shows that Troy Roberts was initially unable to identify the defendant as the shooter because the perpetrator's face had been covered, even though he insisted at trial that he positively identified the defendant at the police station. The defendant also claims that the prosecutor knowingly elicited false testimony from Roberts by asking him if he identified the defendant from a photographic lineup when the prosecutor knew Roberts had only identified the co-defendant's, Lamont Sylvester's, photograph.
Roberts, an eyewitness to the Nachampassak murder, testified at trial that he had identified the defendant through a one-way mirror at the police station on the day of the shooting.[6] He also testified at trial and during a pretrial hearing that he had chosen the defendant's picture from a photographic lineup. When Detective Demma was called to testify after Roberts, *1239 he stated that the witness had never been shown a photographic lineup with the defendant's picture, but that the witness had viewed the defendant through a one-way mirror at the police station. Additionally, Detective Demma stated that Roberts had been unable to positively identify the defendant, because the shooter had worn a mask over his face.
As an initial matter, appellate counsel admits in a footnote in her brief that the portion of the supplemental police report concerning Roberts's failure to identify the defendant had been turned over to the defense during discovery. Furthermore, through Detective Demma's testimony at the preliminary hearing, the prosecution divulged the favorable information that Roberts could not positively identify the defendant as the shooter. Thus, the defendant does not even meet the threshold showing that the prosecution suppressed the information. Brady, 373 U.S. at 88, 83 S.Ct. at 1197; Bagley, 473 U.S. at 678-684, 105 S.Ct. at 3381-3385. Moreover, at trial, Detective Demma again stated that Roberts failed to identify the defendant despite Roberts's testimony otherwise. Defense counsel capitalized on the discrepancy during his closing argument, attacking Roberts's credibility and urging the jury to reject his entire testimony because he lied. Finally, in its general charge, the trial court told jurors that they may disregard the testimony of any witness they determine has lied on any material point.
As to the defendant's claim regarding the prosecution having elicited false testimony from Roberts with respect to his statement that he had identified the defendant from a photographic lineup, it is also without merit. If a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction gained as a result of that perjured testimony, even if the testimony goes only to the credibility of the witness. Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); State v. Broadway, 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814; State v. Williams, 338 So.2d 672, 677 (La.1976).
Upon a review of Roberts's trial testimony, it is clear that Roberts was simply confused over whether he had identified the defendant or the co-defendant, Lamont Sylvester, from a photographic lineup. However, at the close of direct examination, the prosecution indicated to the court that Roberts was never shown a photographic lineup depicting the defendant. When the prosecutor made clear that Roberts had not been shown a photographic lineup with the defendant's picture, but that he had chosen Lamont Sylvester's photograph from a lineup as the second man at the scene of the shooting, Roberts's explained his pretrial testimony:
Iwhat I probably meant was, I identified one man from photographs and I identified the shooter the day of the incident. But I didn't identify the shooter from pictures. I identified the shooter through a mirror.
Additionally, defense counsel, armed with the suppression hearing transcript, extensively cross-examined the witness regarding his mistaken belief that he had identified the defendant from a photographic lineup. Consequently, there is no evidence of perjury.
Within his Brady claims, the defendant also asserts that the prosecutor manufactured Eric Jagneaux's testimony identifying the defendant from the wound on his shoulder, because the police reports make no mention of this identification. While *1240 the police reports do not address Jagneaux's identification of the defendant's injuries, they do make clear that Jagneaux did not positively identify the defendant as the perpetrator. At trial, Jagneaux testified that he saw the perpetrator fire his gun at Danna Nachampassak's car and witnessed the gunman fall to the ground on his left shoulder after the victim's father tackled him. Later that day, Jagneaux viewed the defendant through a oneway mirror and indicated that the wounds on the defendant's shoulder "matched up to where the guy hit the ground." Nevertheless, Jagneaux conceded that he was unable to identify the defendant positively as the gunman, because he did not recognize his face. Furthermore, Detective Demma testified at the at trial that Jagneaux was unable to make an identification of the defendant's face. In addition, defense counsel cross-examined the witness concerning the reliability of his identification and attacked Jagneaux's testimony by pointing out that the defendant's wound appeared on his right shoulder, although Jagneaux claimed the defendant fell on his left shoulder. Consequently, the defendant has not raised a valid Brady issue, and this argument is without merit.
In his final Brady claim, the defendant complains that pretrial descriptions given by five witnesses as to the shirt worn by the perpetrator are inconsistent with the actual sweatshirt introduced into evidence during trial. Of the five witnesses noted by the defendant, only four testified at trial: Eric Jagneaux, Troy Roberts, and Vorana and Danna Nachampassak. The fifth witness, Grace Starr, gave a statement to the police; however, she did not testify at trial.
With the exception of Danna's more descriptive testimony at trial,[7] the defendant fails to show any significant discrepancies between the statements of these witnesses and their testimony at trial. Furthermore, the witnesses' pretrial descriptions and testimony appear to be consistent with the shirt they identified at trial, as they all described the shirt worn by the gunman as black or dark, long-sleeved, and having a stripe across the middle.
Finally, the defendant points to the description furnished by Grace Starr, a witness who did not testify at trial. In her statement, Starr indicates that the two perpetrators, whom she described as chasing each other, wore shirts with a "light blue, light denim, sky blue color." However, a review of Starr's statement reveals a great deal of hesitation on her part; in fact, she ended her remarks by stating, "And I can't recall really ... ever really seein' a thing." Thus, even assuming the prosecution improperly withheld this evidence, Starr's description would have had little impeachment or exculpatory value in light of her uncertainty, the testimony of the other three eyewitnesses who identified the shirt at trial, and the remaining pretrial statements, which corroborate the clothing descriptions provided at trial.

B. Prejudicial and Inflammatory Comments and Misstatements of Law
Within these assignments of error, the defendant next claims that, throughout the guilt and penalty phases of trial, the prosecutor aggressively engaged in a pattern of misconduct calculated to undermine the defendant's right to a fair trial. The defendant *1241 argues that (1) the prosecutor argued facts not in evidence, primarily as to the weather the day on which the defendant was arrested, whether the police officers had actually seen the defendant discarding clothing before his arrest, and why there was no fingerprint evidence; (2) the prosecutor improperly suggested that the defendant had committed other crimes, and (3) during the penalty phase, the prosecutor impermissibly argued biblical authority for the death sentence.
As to the defendant's assertion that the prosecutor argued facts not in evidence during the guilt phase of the trial, none of those arguments point to any reversible error. Regardless, the defendant waived these claims based on prosecutorial misconduct as defense counsel failed to object to any of the comments at the time they were made. Taylor, 669 So.2d at 369.
The defendant also claims that the prosecutor engaged in misconduct during its cross-examination of Chantal Cannon, the defendant's alibi witness who testified that she and the defendant were in her apartment until 6:00 p.m. on November 4, 1996, the day Gary Booker was murdered. First, while questioning the witness about her testimony that the defendant left her apartment around 6:00 p.m. and later returned with money, the prosecutor remarked, "Clifford went and robbed somebody for that $50, didn't he?" At that point, defense counsel objected and asked for a mistrial which the trial court denied after sustaining the objection. The prosecutor then continued making improper remarks by commenting, "I don't blame you," after Ms. Cannon indicated that she had never left the defendant alone in her apartment. Next, the prosecutor in his rebuttal argument continued his attack by asking the jury, "Now, where do you go get money in the St. Thomas project on a Saturday night. ATM machine? He looks like he's got an ATM card to you?" After defense counsel objected, the trial court sustained the objection and instructed the prosecutor to refrain from "comment[ing] like that." Finally, in closing argument at the guilt phase, the prosecutor argued:
And armed robbers and people that are criminals tend to take the clothing off because sometimes-[defense objection overruled] Sometimes they take their clothes off because people are going to remember black or purple clothing or whatever clothing it is. So you take the clothing off as you're running back to home base. Back to home. Back to where you know. Back to 2062 Annunciation where your girlfriend lives.
In the defendant's view, the prosecutor's remarks implied criminal conduct on part of the defendant and were intended to inflame the passions of the jury. While the inference raised by the prosecutor during cross-examination of Ms. Cannon was better suited to closing argument, the trial court admonished the prosecutor and instructed the jury to disregard the remarks. The defendant has not demonstrated that those remarks, which the trial judge properly instructed the jury to disregard, warranted a mistrial, La.Code Crim. Proc. art. 770, or that they so influenced the jury as to undermine the reliability of the jury's verdict. Thus, this claim is also without merit.
Turning to the defendant's argument of improper argument regarding the penalty phase, the defendant asserts *1242 that the prosecutor's "eye for an eye"[8] argument, along with references to Moses and the Ten Commandments, impermissibly suggested that God's law required the imposition of the death penalty.[9] In State v. Monroe, 397 So.2d 1258, 1271 (La.1981), we criticized the "eye for an eye, a tooth for a tooth" argument as improper, but found no reversible error since the argument when considered as a whole lost "much of its objectionable flavor." The same can be said of the instant case. Moreover, we do not find that the prosecutor's improper remarks so influenced, prejudiced, or diverted the jurors from their sentencing obligations, which the trial judge correctly set forth in his charge to them after argument, that they contributed to their recommended sentence of death. See State v. Howard, 98-0064 p. 14 (La.4/23/99), 751 So.2d 783, 801.

C. Violation of Gag Order
In his final argument within these assignments, the defendant contends that the prosecution discussed the instant case with the media, in violation of a gag order imposed by the trial court. However, as the defendant points out, the complained-of comments were published in the newspaper and televised after the voir dire examination had commenced; thus, there is little chance that the sequestered jury was exposed to media coverage of the trial. Moreover, a review of the newspaper articles reveals that defense counsel also violated the gag order, informing reporters that he planned "to proveat least in the NaChampassak murderthat the identification of his client by the infant's mother is unreliable." See Alfred Charles, Baby's Accused Killer on Trial, Times Picayune, August 26, 1996, at A6. Television coverage submitted by appellate counsel also shows both the prosecution and the defense holding press conferences with the media. Under these circumstances, the defendant has not demonstrated any prejudice sufficient to require a reversal.

Insufficient Evidence of Guilt for Gary Booker's Murder
In assignments of error nos. 19-20, the defendant claims that the state presented insufficient evidence to sustain his conviction for the first degree murder of Gary Booker because the state's case consisted of "incredible testimony" from two witnesses who identified the defendant as the perpetrator. Alternatively, the defendant maintains that the evidence only supports a conviction of second degree murder because the state's evidence failed to establish the commission of an armed robbery.
In reviewing the sufficiency of the evidence to support a conviction, this court follows the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In Jackson, the Supreme Court stated that a reviewing court must determine whether the evidence, viewed in the light most favorable to the *1243 prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. Id.; Hoffman, 768 So.2d at 585; State v. Captville, 448 So.2d 676, 678 (La.1984). In the instant case, the prosecution had to establish that the defendant had the specific intent to kill or inflict great bodily harm and that the murder occurred during the commission of attempted armed robbery or armed robbery. See La. R.S. 14:30(A)(1).
Without challenging the evidence that Gary Booker's shooter had the requisite specific intent to kill, the defendant first argues that the evidence does not support the jury's finding that he was, in fact, the man who shot Gary Booker. Primarily, the defendant challenges the credibility of the prosecution's two eyewitnesses. He points to Kevin Bryant's identification, arguing that Bryant identified him from a photographic lineup based solely on hearsay.[10] The defendant also attacks the testimony of Kelly, noting that he was incarcerated at the time of trial for a probation violation and was belligerent on the stand. The defendant contends that Chantal Cannon, his alibi witness, and Hishaunda Riles, who identified Lamont Sylvester as the shooter, were far more credible than the state's witnesses. The defense argues that no rational trier of fact could have believed Bryant's and Kelly's allegations without additional proof, especially in light of conflicting testimony from the defense witnesses.
Even disregarding Bryant's identification of the witness and taking into consideration Kelly's belligerent attitude on cross-examination and his criminal history, the fact remains that the Kelly, who had known the defendant for years, made a positive identification of him from a photographic lineup and at trial as the gunman who stood over Gary Booker and shot him eight times. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. Howard, 751 So.2d at 801. Thus, "a reviewing court may impinge on the fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." Id. (quoting State v. Mussall, 523 So.2d 1305, 1310 (La.1988)). In the instant case, a rational trier of fact could have accepted Kelly's eyewitness testimony and concluded that the defendant was the man who shot Gary Booker.
The defendant argues that, alternatively, there is insufficient evidence to support the jury's verdict that the defendant is guilty of first-degree murder. The defendant first contends that because the jury did not find the aggravating factor that the murder occurred during the perpetration or attempted perpetration of an armed robbery in its penalty phase verdict, that it implicitly acquitted the defendant on that charge. Second, the defendant argues that even without the jury's inconsistent findings at the guilt and penalty phases, Kelly's and Bryant's unreliable testimony was insufficient to prove that an armed robbery occurred. With respect to the defendant's first argument, as discussed infra, this court has held that *1244 a jury's failure to find an aggravating factor during the penalty phase of a capital trial does not constitute an acquittal of that aggravating factor. See State v. David, 468 So.2d 1126 (La.1984), cert. denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986).
Regarding the defendant's second argument that the eyewitness testimony was insufficient to prove that an armed robbery occurred, we find that argument also to be without merit. To prove that an armed robbery, or attempted armed robbery, occurred, the prosecution must demonstrate that the defendant (1) took, or attempted to take, anything of value from the victim, (2) by use of force or intimidation, (3) while armed with a dangerous weapon. La.Rev.Stat. § 14:64; State v. Seals, 95-0305, p. 18 (La.11/25/96), 684 So.2d 368, 381. In the instant case, both Kelly and Bryant testified at trial that the defendant approached them and asked for a dollar. Kelly testified that the defendant showed him and the victim a gun after they refused and then stated, "Man, I've got a gun. Y'all still ain't gonna give me a dollar?". Finally, Kelly stated that after he heard gunshots, he turned and saw the defendant shoot the victim seven to eight times, before going through the victim's pocket and taking his money.
While there is no other evidence that an armed robbery or attempted armed robbery occurred, the jury was clearly within its providence to believe Cedric Kelly's eyewitness testimony. See Howard, supra. If Kelly's testimony was accepted as true, a rational trier of fact could have concluded that the defendant perpetrated or attempted to perpetrate an armed robbery. The defendant's act of demanding a dollar and showing the gun to the victim along with Kelly's observation of the defendant going through the victim's pocket after shooting him all support the prosecution's armed robbery charge. It was rational for the jury to conclude that the defendant (1) intended to, or did, take something of value from the victim (his money) (2) through use of force or intimidation (by showing him the gun and then shooting him) (3) while armed with a dangerous weapon (the .22 caliber revolver). La.Rev.Stat. § 14:64. Therefore, we find that there was sufficient evidence to support the jury's first-degree murder conviction.

Insufficient Evidence of Heinous Nature of Offenses
In assignments of error nos. 21 and 27, the defendant argues that the jury's findings in the penalty phase that both murders were committed in an especially heinous and cruel manner under La.Code Crim. Proc. art. 905.4(A)(7) are not supported by the evidence. Upon a review of the record, we must agree that the evidence does not support the jury's findings that either victim was killed in an especially heinous manner.
For a crime to have been committed in an especially heinous or cruel manner, the evidence must support a finding of torture or pitiless infliction of unnecessary pain. Hoffman, 768 So.2d at 574; State v. Hamilton, 92-1919, p. 15 (La.9/5/96), 681 So.2d 1217, 1226; State v. Eaton, 524 So.2d 1194, 1210 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807, rehg. denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989); State v. Brogdon, 457 So.2d 616, 631 (La.1984). To support a finding of heinousness, this court has also held that the death must have been particularly painful and carried out in an inhumane manner, so that the victim experienced great pain and was aware of *1245 his impending death. See Castleberry, 758 So.2d at 774 (finding that heinous nature of crime supported given that defendant forced the victim to look at him before beating him about the head with an iron skillet with such force that the skillet broke and then, finding the victim still alive, smothered him to death, all while the victim was bound and gagged); Howard, 751 So.2d at 807 (determining that evidence of beating and multiple knifing lacerations to the 82 year old victim's face, neck, and chest along with the presence of defensive wounds indicating a struggle between the victim and the assailant supported jury's finding of pitiless infliction of pain and suffering); Frost, 727 So.2d at 437 (finding sufficient evidence of heinous and cruel nature of crime where victim was stabbed twenty-six times with a steak knife, fought violently for her life, was conscious during the struggle, and was eventually stomped on the face several times); State v. Rault, 445 So.2d 1203, 1219 (La.1984) (holding that heinous, atrocious, or cruel aggravating circumstance proven when victim was raped, strangled, stabbed in the neck and shot twice); State v. Flowers, 441 So.2d 707, 718 (La.1983) (affirming heinous, atrocious, or cruel circumstance where seventy-year-old widow was severely beaten, raped, and strangled in her home); State v. Willie, 436 So.2d 553, 556-57 (La.1983) (determining that crime was heinous, atrocious, or cruel where victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed).
However, this court has found that when a victim's wounds were inflicted to kill, not to maim or inflict pain, a return of the heinousness aggravating factor may be precluded, or that even where the circumstances of the offense are otherwise gruesome or cold-blooded, if there is no evidence of torture or prolonged pain, the crime most likely does not fall under the court's definition of heinousness. State v. Tassin, 536 So.2d 402, 411 (La.1988) (finding that circumstance where victim was shot at close range several times did not support finding of heinousness); State v. Wilson, 467 So.2d 503, 521 (La.1985) (holding that killing did not fall within category of the cruel, heinous, and atrocious crimes, where the victim was shot once in the head and neck from a distance of no less than twenty-four inches with a sawed-off, 12 gauge shotgun); State v. Culberth, 390 So.2d 847, 851 (La.1980) (finding that where victim was stabbed five times with the intent to kill, even if the killing itself was a cruel and heinous act, such a murder was not intended to fall under the heinous category of crimes as there was no evidence of torture or abuse).

A. Gary Booker's Murder
At the penalty phase in the instant case, the prosecutor argued that the murder of Gary Booker was particularly heinous because the victim suffered approximately 30 seconds after being shot once in the back of his chest before the defendant shot him seven more times. According to the coroner's testimony, the victim could have survived the first bullet wound; however, the other seven bullets went through his heart and lungs causing the victim to go into shock within a few seconds. In the coroner's opinion, the victim probably died within five minutes after the last shot was fired into his body.
Thus, the evidence does not support a finding that the defendant inflicted serious physical abuse or pain on the victim before he died. The defendant's actions in standing over the defendant and continuing *1246 to shoot him, while cold-hearted, do not reflect an intent to inflict pain pitilessly or to torture; rather, the gunshot wounds were inflicted to kill. Further, the victim died within a relatively brief span of time, and several of the shots were fired after the victim was unconscious or dead. Therefore, the aggravating factor of heinousness is not supported by the evidence concerning the nature and manner of the murder and is accordingly invalid.
The defendant incorrectly argues that, because the jury only returned the one invalid aggravating factor in its penalty verdict for the Gary Booker murder, it rejected the other possible aggravating factor presented, that the murder occurred during the perpetration, or attempted perpetration, of an armed robbery, and, thus, acquitted him on the death penalty. The defendant contends that double jeopardy principles bar another sentencing hearing on this count. However, this court has held that a jury's finding of a single aggravating factor during the penalty phase of a capital trial does not constitute an acquittal of the other aggravating circumstances presented to the jury. See David, supra.
Specifically, the court in David reasoned that, during a penalty hearing, the jury is not required to adjudge the sufficiency of each aggravating circumstance argued by the prosecution, but is only instructed that it may consider the death penalty upon the finding of at least one aggravating circumstance. David, 468 So.2d at 1137; La. Code Crim. Proc. art. 905.3. The court concluded that the jury in that case most likely responded to the legal charge that they needed only to find one statutory aggravating circumstance, and that, upon finding one, they moved on to consider mitigating circumstances and sentence recommendation. David, 468 So.2d at 1137. Thus, the court instructed that under Louisiana's procedure, a jury's finding of one aggravating factor does not indicate that the jury considered and rejected every other possible aggravating circumstance. Id.
Subsequent to this court's holding in David, the Supreme Court decided the case of Poland v. Arizona, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), in which its decision confirmed this court's reasoning in David. In Poland, the defendant received the death penalty after the trial court found one of two possible aggravating circumstances applicable. On appeal, however, the trial court's interpretation of the law was deemed erroneous, and the case was remanded for a new sentencing hearing. The Supreme Court held that, as the defendant had not been acquitted of the death penalty in the first trial, there was no double jeopardy bar against the state submitting the same aggravating circumstances and seeking the death penalty in a subsequent trial. Id. at 155-57, 106 S.Ct. 1749. The Court found that double jeopardy principles, which are in place to protect the finality of acquittals are not implicated when a defendant is sentenced to death in the first instance, but receives a new penalty hearing. Id. (distinguishing its earlier opinion in Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), where it held that, if a defendant receives a life sentence in the first instance, the defendant is essentially acquitted of whatever was necessary to impose the death sentence).
The defendant in the instant case attempts to distinguish this case from David by pointing to the verdict sheet for the Gary Booker murder as evidence that the jury considered the felony aggravating circumstance *1247 and rejected it. According to the defendant, the verdict sheet reveals that after the jury found the heinousness factor, the jury wrote, then erased, the aggravating factor that the offense occurred during the commission of an armed robbery. While the copy of the verdict sheet contained in the record does show some markings which may indicate erasure, the defendant's claim remains speculative at best. As the jury clearly found at the guilt phase of the trial that the defendant committed the murder during the perpetration or attempted perpetration of an armed robbery, we can only guess that perhaps, it did not feel it needed to make that same finding twice.
Regardless, the reasoning of both David and Poland is clearly applicable to the present case. Double jeopardy principles will not preclude the prosecution from resubmitting the aggravating factor that was not initially returned by the jury at a new penalty hearing. Therefore, the case is remanded to the trial court for a new penalty hearing, where the state will be allowed to present and argue all aggravating circumstances supported by the record.

A. Etienne Nachampassak's Murder
The defendant also argues that the jury's finding that Etienne Nachampassak was killed in a heinous and cruel manner is not supported by the evidence. Upon our review of the record, we must agree that there is insufficient proof of that aggravating factor, as the infant died from a single gunshot wound to the head. There is no evidence that the killing involved any element of torture or pitiless infliction of unnecessary pain. See Hamilton, 681 So.2d at 1226. Additionally, the evidence supports a finding that the wound was inflicted to kill, not to maim or inflict unnecessary pain. See Tassin, 536 So.2d at 411.
However, the failure of one statutory aggravating factor does not invalidate others that were properly found, unless introduction of evidence in support of the invalid factor interjected an arbitrary factor into the proceedings. Hoffman, 768 So.2d at 575; Castleberry, 758 So.2d at 774. In the present case, the jury found three other valid aggravating factors: (1) the murder occurred during the attempted perpetration of an armed robbery; (2) the defendant knowingly created a risk of death or great bodily harm to more than one person; and (3) the victim was under the age of twelve. The evidence regarding the invalid factor of heinousness in this case did not interject an arbitrary factor into the proceedings, as evidence of the manner in which the offense was committed and of the nature of Etienne's injuries was clearly relevant and properly admitted at trial. Thus, while we find that the jury's return of heinousness as an aggravating factor in its death verdict for the Nachampassak murder is invalid based on the evidence in the record, that error does not present us with grounds for a reversal of the defendant's death sentence, as the jury also returned three other valid aggravating circumstances.

Ineffective Assistance of Counsel
In assignments of error nos. 5-6, the defendant claims he received ineffective assistance of counsel at all stages of his trial. Initially we note that ineffective assistance of counsel claims are usually addressed in post-conviction proceedings, rather than on direct appeal. Brumfield, 737 So.2d at 668; State v. Hart, 96-0697, p. 15 (La.3/7/97), 691 So.2d 651, 661. We *1248 have, however, addressed such claims on direct review if the evidence needed to decide the issue may be found in the record. State v. Mitchell, 94-2078, p. 6 (La.5/21/96), 674 So.2d 250, 255; State v. Cousan, 94-2503, pp. 15-16 (La.11/25/96), 684 So.2d 382, 391-92. In the instant case, the defendant raises six different ineffective assistance of counsel claims. While the record would provide this court with adequate information to address some of those issues on direct review, it does not contain sufficient evidence to resolve all of the defendant's claims. See State v. Hampton, 98-0331, p. 8 (La.4/23/99), 750 So.2d 867, 877. Therefore, in accordance with our normal procedure, we find that these arguments would be best relegated to post-conviction relief.

CAPITAL SENTENCE PROPORTIONALITY REVIEW
Under La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. Rule 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making that determination, we consider whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI"). In addition, the defendant has filed objections to the UCSR. The prosecution also submitted a Sentence Review Memorandum.
The CSI indicates that the defendant is an African American male born on October 19, 1973. He was twenty-two years old at the time of the offenses. The defendant has two siblings, a brother and sister. He has resided with his mother almost his entire life. At one point, a stepfather, named Kenneth Washington, lived with him and his mother. The defendant also indicated that his stepfather beat him on numerous occasions.
As for his educational and work background, the defendant quit school at the age of sixteen after completing the ninth grade. The defendant, classified as a slow learner, was placed in special education classes at an early age. According to the defendant, he suffered a head injury which required hospitalization while he was in elementary school. His work history consists mainly of manual labor, including jobs in construction and as a dishwasher at several downtown restaurants. When questioned about drug and alcohol use, the defendant stated that he had been exposed to alcohol since the age of six and over the course of his life, he has tried marijuana, cocaine, and heroin. The defendant further related that he was "strung out" on cocaine and heroin two to three days before his arrest on the instant offenses.
The CSI reveals that the defendant is classified as a fourth felony offender. No juvenile record was indicated or found. His adult record shows convictions for auto theft, simple burglary, flight from an officer, theft over $500, and battery on a police officer. According to the UCSR, a psychiatric evaluation was conducted, which indicates that the defendant was able to distinguish right from wrong and was capable of cooperating in his own defense.

Passion, Prejudice, and other Arbitrary Factors
The defendant maintains that pretrial publicity, particularly the coverage concerning *1249 the murder of Etienne Nachampassak, injected passion, arbitrariness, and caprice into the proceedings. This claim was treated to a certain extent in the defendant's assignments of error addressed in depth above. It is not disputed that the shooting of Etienne Nachampassak generated widespread publicity and community outrage. However, the trial took place in the latter part of August 1996, approximately ten months after the death of the victims and the initial flurry of publicity. Furthermore, a review of the news coverage submitted by appellate counsel reveals that the media did not focus exclusively on the details of the offenses with which the defendant was charged, but emphasized more generally the amount of crime affecting the Irish Channel neighborhood where those murders took place. Additionally, although passions were running high in the community, the record of voir dire reveals that only one prospective juror in the entire venire held a preconceived opinion respecting guilt or punishment based on the publicity to which he had been exposed, and that juror was disqualified. Our review of the record, therefore, does not provide any indicia of passion, prejudice, or any other arbitrary factors as tainting the reliability of the jury's death sentence for the Nachampassak murder.

Aggravating Circumstances
At trial, the prosecution argued that the following aggravating circumstances existed for the Etienne Nachampassak murder: (1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; (2) the offender knowingly created a risk of death or great bodily harm to more than one person; (3) the offense was committed in an especially heinous, atrocious, or cruel manner; and (4) the victim was under the age of twelve years. La.Code Crim. Proc. art. 905.4. The jury found that all four of the aggravating circumstances urged by the prosecution existed. However, as discussed above, the evidence does not support that the murder was committed in an especially heinous, atrocious, or cruel manner. Nevertheless, the admission of evidence on that invalid aggravating circumstance did not interject an arbitrary factor into the proceedings, because evidence of the manner in which the offense was committed and of the nature of the infant victim's injuries was relevant and properly admitted at trial. See State v. Roy, 95-0638, pp. 19-20 (La.10/4/96), 681 So.2d 1230, 1242 (citing State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190).

Proportionality
Although the United States Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), in Louisiana, a comparative proportionality review remains a relevant consideration in determining the issue of excessiveness. Castleberry, 758 So.2d at 774-75; State v. Burrell, 561 So.2d 692, 711 (La.1990). In determining whether a death sentence is excessive, we consider whether the sentence is disproportionate to the penalty imposed in other similar cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. See State v. Sonnier, 380 So.2d 1, 7-8 (La. 1979).
As noted above, the valid aggravating circumstances in the murder of Etienne Nachampassak were that the offense was committed during the course of an *1250 attempted armed robbery; that the offense created a risk of harm to more than one person; and that the victim was under the age of twelve years. Juries in Orleans Parish have recommended that the death penalty be imposed on thirty-seven defendants, including the instant case. In thirty of those cases the jury found at least one of the three aggravating circumstances found by the jury in this case. Twenty-two of those cases involved homicides committed during the commission of an armed robbery; six involved at least the aggravating circumstance that the offender created a risk of death to more than one person; nine of the cases involved the two combined circumstances that the offender was engaged in an armed robbery giving rise to a risk of death to more than one person; and one case involved the killing of a victim under the age of twelve. In conclusion, there are numerous cases, both out of Orleans Parish and state-wide, in which this court has found that a death sentence was appropriate and proportionate for offenses similar to the instant one. See e.g., State v. Davis, 92-1-623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359, reh'g. denied, 513 U.S. 1066, 115 S.Ct. 687, 130 L.Ed.2d 617 (1994); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. Taylor, 422 So.2d 109 (La. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983). A comparison of the present defendant's case with the above-referenced cases, indicates that the death penalty as applied to the instant defendant is not disproportionate considering the offender and the offenses.

CONCLUSION
The defendant's conviction and death sentence are affirmed as to the count for Etienne Nachampassak's murder. Additionally, the defendant's conviction for the murder of Gary Booker is affirmed. However, because the jury only returned the one invalid aggravating circumstance of heinousness as to that offense, the case is remanded to the trial court for a new penalty hearing on the Gary Booker murder.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed as to Count 2, involving the murder of Etienne Nachampassak. In the event this judgment becomes final on direct review when either: (1) the Defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the Defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state postconviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. § 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in state courts.
NOTES
[1] The assignments of error not discussed in this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are reviewed in an unpublished appendix that will comprise a part of the official record in this case.
[2] The second man was Sylvester Lamont, a co-defendant on this count, who was tried separately and found guilty of second degree murder of Etienne Nachampassak on September 5, 1996.
[3] As will be discussed at greater length infra, the jury returned a guilty verdict on the Gary Booker first degree murder charge, finding that the murder was committed during the commission, or attempted commission, of an armed robbery; however, that same aggravating factor was not returned by the jury in its penalty verdict.
[4] Following the conclusion of the court's death qualification, the questioning was opened up to allow the attorneys to question jurors about other matters.
[5] We also note that at least one bench conference involving an identification made by Mr. Nachampassak was placed on the record, suggesting that had the attorneys requested, others would have been as well.
[6] Troy Roberts, Eric Jagneaux, and Frank Borga were on their lunch break at the time of the Nachampassak murder. Roberts had parked his truck at the corner of Constance and First Streets and had gone in the corner store located there to buy cigarettes before they all returned to work. The three men were getting ready to leave, when the incident occurred less than a block away.
[7] As discussed previously, Danna's statement described the perpetrator's clothing as jeans and a t-shirt, but at trial she described the clothing as dark, dark jeans, and a long-sleeved dark shirt.
[8] Specifically, the prosecutor argued, "An eye for an eye? A life for a life. This is more than that. This is one life for two lives. Not one, two."
[9] We note that, as this case was tried before the date of our recent decision in State v. Wessinger, 98-1234, pp. 19-20 (La.5/28/99), 736 So.2d 162, 180, where we held that the contemporaneous objection rule will apply to penalty-phase errors as well as guilt-stage errors in capital cases heard after the date of that decision, the failure of counsel to object to the prosecutor's argument does not bar our review of the introduction of the allegedly improper remarks.
[10] In his assignment of error no. 17, the defendant argues that Kevin Bryant's out-of-court and in-court identifications should have been suppressed, as the identifications were based entirely on Cedric Kelly's having told him that the defendant was the gunman. As discussed in the appendix, we do not find that the admission of Bryant's identifications constituted reversible error.