NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

11-904

STATE OF LOUISIANA

VERSUS

L. W.

**********

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 131263,131267,131268
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and James T. Genovese, Judges.

PETERS, J., concurs in part, dissents in part, and assigns written reasons.

CONVICTIONS FOR ATTEMPTED AGGRAVATED INCEST, TWO COUNTS OF ATTEMPTED MOLESTATION OF A JUVENILE, AND ONE COUNT OF ATTEMPTED ORAL SEXUAL BATTERY AFFIRMED. CONVICTIONS AND SENTENCES FOR TWO COUNTS OF ATTEMPTED MOLESTATION OF A JUVENILE VACATED AND SET ASIDE, AND JUDGMENTS OF ACQUITTAL ENTERED.

**Cecil R. Sanner**
**District Attorney – Thirty-eighth Judicial District**
**W. Thomas Barrett, III**
**Assistant District Attorney**
**P. O. Box 280**
**Cameron, LA 70631**
**(337) 474-7311**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Mark Owen Foster**
**Louisiana Appellate Project**
**P. O. Box 2057**
**Natchitoches, LA 71457**
**(318) 572-5693**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **L. W.**

**PICKETT, Judge.**

## FACTS

On or about April 15, 2006, through June 8, 2006, the defendant, L.W.,[1] the husband of the victim's maternal grandmother, allegedly engaged in sexual misconduct with the victim, his nine-year-old step-grandson, while in his care.

On November 6, 2007, the defendant was charged by bill of information with three counts of aggravated incest, violations of La.R.S. 14:78.1, three counts of molestation of a juvenile, violations of La.R.S. 14:81.2, and two counts of attempted oral sexual battery, violations of La.R.S. 14:27 and 14:43.3.[2] On December 10, 2010, a jury found the defendant guilty of the responsive verdict of attempted aggravated incest and not guilty of the remaining two counts of aggravated incest. He was found guilty of the responsive verdicts of attempted molestation of a juvenile on all three molestation counts. He was found guilty as charged on one count of attempted oral sexual battery and guilty of the responsive verdict of attempted molestation of a juvenile on one count of attempted oral sexual battery.

The defendant was sentenced on March 1, 2011, to serve ten years at hard labor for attempted aggravated incest. For each conviction of attempted molestation of a juvenile, he was sentenced to seven and one-half years at hard labor, to run concurrently with each other and consecutively to his sentence for attempted aggravated incest. Lastly, for each conviction of attempted oral sexual battery, the defendant was sentenced to five years at hard labor, to run concurrently

---

[1]The instant case involves sex offenses and a victim under the age of eighteen; thus, initials are used herein to protect the victim's identity pursuant to La.R.S. 46:1844(W).

[2]All the minutes prior to trial incorrectly indicate that the defendant was charged with four counts of aggravated incest and four counts of molestation of a juvenile. The record reflects, however, that the defendant was charged with three counts of aggravated incest in docket numbers 131263, 131264, and 131265, and with three counts of molestation of a juvenile in docket numbers 131267, 131268, and 131269.

with each other and consecutively to his sentences for attempted aggravated incest and attempted molestation of a juvenile. The defendant did not file a motion to reconsider his sentences.

The defendant is now before this court, seeking review of his convictions.

## ASSIGNMENTS OF ERROR

1. The record is unconstitutionally deficient in that none of the state or defense peremptory challenges, and almost none of the challenges for cause were recorded.

2. The evidence is insufficient to convict Mr. Wilson, considering the internal contradictions and irreconcilable differences in the victim's testimony.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

The defendant was charged by separate bills of information with the offenses of aggravated incest, molestation of a juvenile, and attempted oral sexual battery.[3] Each of these offenses is punishable with or without hard labor, thus requiring a trial by jury of six, all of whom must concur to render a verdict. La.R.S. 14:78.1, 14:81.2, 14:27, 14:43.3, and La.Code Crim.P. art. 782. The defendant was convicted by a unanimous concurrence of a twelve person jury. We find that the error in this case is harmless.

In *State v. Jones*, 05-226, p. 6 (La. 2/22/06), 922 So.2d 508, 513, the Louisiana Supreme Court held:

Furthermore, we find that the empaneling of a jury composed of a greater number of persons than constitutionally required is no longer a

_____

[3]The bills of information charging the offenses of molestation and aggravated incest have the word "attempted" handwritten in before the names of the offenses. It appears this was done after the jury returned the responsive verdicts of attempt because the defendant was tried for the completed offenses, and the state did not include the statutory citation for attempt on these bills.

2

non-waivable jurisdictional defect subject to automatic nullity. Hence, we find Jones' unanimous verdict by twelve jurors, when the constitution requires a unanimous jury of six persons, was harmless error.

## ASSIGNMENT OF ERROR NUMBER TWO

This assignment of error is addressed first in the event the defendant is entitled to an acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992). "When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot." *Id*. at 734.

By this assignment of error, the defendant argues that the evidence used to convict him is legally insufficient to support the convictions against him. The defendant acknowledges that in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the fact finder, is sufficient to support a conviction. *State v. H.L.J.*, 08-1070 (La.App. 3 Cir. 4/1/09), 6 So.3d 997. In the instant case, the defendant contends that the only evidence of the offenses was the victim's contradictory statements. As such, the Defendant maintains that an internal contradiction exists; thus, the victim's testimony, alone, is not sufficient evidence to convict him of the offenses.

The analysis for a claim of insufficient evidence is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and

> therefore, the appellate court should not second guess the credibility
> determinations of the triers of fact beyond the sufficiency evaluations
> under the *Jackson* standard of review. *See State ex rel. Graffagnino*,
> 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228
> (La.1983)). In order for this Court to affirm a conviction, however,
> the record must reflect that the state has satisfied its burden of proving
> the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The defendant was convicted of attempted aggravated incest, three counts of attempted molestation of a juvenile, and two counts of attempted oral sexual battery. The defendant, however, does not contest the specific elements of these crimes. The issue before this court is whether an internal contradiction exists between the victim's statement made prior to trial and his trial testimony such that his testimony, alone, is insufficient to support his convictions.

At trial, Detective Christopher Savoie with the Cameron Parish Sheriff's Office testified that on June 8, 2006, Deputy Carl Conner, a patrol deputy, advised him of a possible molestation involving a juvenile. The case was not "fresh," and there was no physical evidence to be collected at any scenes. Detective Savoie instructed Deputy Conner to avoid speaking to the victim because he would be interviewed by the Child Advocacy Center (CAC). Detective Savoie's first contact with the victim's mother was the next day when he informed her that the victim's interview was scheduled on June 13, 2006.

Detective Savoie testified that the victim's parents brought him to the interview. Just prior to the interview, Detective Savoie spoke with the interviewer, Amy Dufrene, about the specifics of the case. He and Ms. Dufrene then discussed the case with the victim's parents in a roundtable discussion. At that time, the victim's parents told Detective Savoie and Ms. Dufrene about incidents they thought had occurred, including incidents that were not initially reported to Deputy Conner. After the initial interview with his parents, the victim was interviewed by

4

Ms. Dufrene while Detective Savoie watched the interview remotely. During the interview, Detective Savoie had contact with Ms. Dufrene via an earpiece.

According to Detective Savoie, some of the incidents described by the victim in his interview were different from the second-hand information he had heard prior to the interview. Detective Savioe was told by the victim's parents that an incident happened in a truck, whereas in his interview, the victim did not say anything about an incident that occurred in a vehicle. Also, the victim did not report that he and the defendant had engaged in oral sex. The victim described one incident of actual sexual contact toward the end of the interview. Lastly, the victim stated that the defendant had threatened him with a knife.

Detective Savoie scheduled a physical examination which took place on July 26, 2006. The examining physician did not obtain any physical evidence.

Ms. Dufrene testified that her interview with the victim was recorded and lasted about forty-five minutes. The interview was then played for the jury. In the interview, the victim described several incidents of sexual abuse while in the defendant's care. The first incident recalled by the victim occurred when he was five years old during a week-long stay with his grandparents at Toledo Bend. While the victim's grandmother was away, the defendant exposed his penis and asked the victim to play with it. The victim ran from the home and was picked up by two ladies who dropped him off at his grandmother's shop. The victim did not tell his grandmother what had happened because the defendant threatened to harm him. When the victim returned to his home in Cameron, he told his mother what had happened.

Another incident occurred when the victim was nine years old at his grandparents' home in Westlake. While his grandmother was at work, the defendant exposed his penis to the victim and asked him to perform oral sex. The

5

victim refused to comply and ran from the home to his friend's house. The victim did not tell anyone what had happened because the defendant threatened to cut him with a knife.

The victim then described two more incidents that happened when he was ten years old at his grandparents' home in Cameron. On one occasion, while sitting in his recliner, the defendant asked the victim to play with his penis and to perform oral sex. The victim refused and went to his aunt's house. Again, he did not tell his aunt what had transpired because the defendant threatened to hurt him. On the other occasion, the defendant tried to physically force the victim to fondle his penis and to perform oral sex. The victim stated that he threw something into the defendant's eyes and ran away. Both incidents occurred in the defendant's home in Cameron.

Near the end of his interview, the victim stated that another incident occurred when he was ten years old at his grandparents' home in Cameron. The victim stated that the defendant stuck his "stuff," referring to the defendant's penis, in his "butt." The victim explained that the defendant was behind him, and he could not see the defendant's penis. The victim stated, however, that he could feel the defendant's penis inside his "butt" before he pushed the defendant off of him.

With regard to the victim's demeanor during his interview, we note he appeared significantly uncomfortable about describing the details of the various incidents. The victim referred to the defendant's penis as his "stuff" or either pointed to his own penis when asked by Ms. Dufrene to either explain what had happened or what he saw. He refused to use the word "penis." The victim fidgeted throughout the interview, becoming increasingly active as the interview progressed. At times, the victim played with a toy, walked around, and would not look at Ms. Dufrene. With regard to the victim's behavior during the interview,

Ms. Dufrene testified at trial that it was very normal for a child in this type of interview to appear inattentive or disrespectful. She also explained that it was very typical for a child the victim's age to be embarrassed and avoid eye contact.

At the time of trial, the victim was fourteen years old, was an eighth-grade student, and had been living with his father for about four months. Prior to that time, the victim was living with his mother in Indiana.

When asked what the defendant did to him while he was living in Cameron a few years ago, the victim stated that the defendant raped him. When asked if there were some other things the defendant had done to him, the victim responded, "He stuck his thing up my butt." The victim confirmed that there were things the defendant asked him to do, but when asked to elaborate, he had some difficulty testifying due to being nervous. He was consoled by the trial court before questioning continued. The victim then testified that he was ten years old when the offenses occurred at his grandparents' house in Cameron. He was living with his aunt at the time, located about a mile from his grandparents' house.

Next, the victim went into greater detail about the various offenses that occurred in Cameron. In addition to one occasion when the defendant raped him anally with his penis, the victim testified that on about four occasions, three times in the house and once in the truck, the defendant asked the victim to perform oral sex. The victim refused, telling him, "No," and walked outside. Additionally, the defendant tried to force the victim to perform oral sex by grabbing him by the arm and pulling him. The defendant threatened to cut him with a box blade if he told anyone.

The victim was then questioned as follows:

Q:    Did [L.] ever put his mouth on your penis?

A:    Yes, sir.

7

Q:      That happened in Cameron?

A:      Yes, sir.

Q:      Did it happen more than once?

A:      Just once.

Q:      Did [L.] ever have you touch his penis?  Did he make you do it or did he –

A:      No, sir.

Q:      Okay.  So you never had to do that?

A:      No, sir.

Q:      On the – the times that you were telling me earlier about [L.] asking you to suck his thing –

A:      Yes, sir.

Q:      -- would he show you his thing?

A:      Yes, sir.

The victim acknowledged that at some point, he told his aunt, Ms. D., about some of the things that had happened but not everything; he was scared of the defendant.  The victim was also afraid to tell his other family members everything that happened.  The victim recalled meeting with Ms. Dufrene about a month later who asked him questions about what happened.   The victim stated that he told Ms. Dufrene everything that had happened.

The victim testified that he did not know what happened following the defendant's arrest – whether or not he was still in jail or that a trial was going to take place.  The victim thought "it was all over with," because four years had passed since he had reported the abuse, and no one from the sheriff's office or district attorney's office had contacted him during that time.   The victim acknowledged seeing his aunt on the Sunday prior to trial.   He did not say anything to her about the allegations, however.

Next, the victim testified about the incident that occurred during a weekend-stay with his grandparents at their home at Toledo Bend when he was about four years old. While his grandmother was at work, the victim left their home and went walking down the street on his own. Two ladies picked him up and dropped him off at the store where his grandmother was working. When the victim returned to Cameron with his parents, he told them that the defendant had tried to do something to him. Afterwards, he did not see his grandmother for a couple of years. The victim also testified that the police came to see him about the offense, but he did not remember who they were, if he was interviewed about the offense, or if a trial had taken place. After a few years without seeing his grandmother, the victim told his parents that the offense did not happen because he did not get to see his grandmother. After he recanted the allegation, he was able to see her again. Despite the fact he later recanted the allegation so he could see his grandmother, the victim maintained that the incidents actually did occur, just the way he had described it. The victim also maintained that his mother never told him to make the allegations.

On cross-examination, the victim testified that his aunt was the first person he told about the offenses because he trusted her the most. He then told his mother. He recalled walking next door to his aunt's house by himself. The victim did not remember what he told his aunt. Although he told Ms. Dufrene that his mother was the first person to whom he reported the offenses, the victim testified at trial that he and his mother had been fighting, and his mother was not the first person he told. When asked why he decided to tell someone at that particular time, the victim responded, "I couldn't hold it in no more." After telling his aunt, she instructed him to tell his mother and the rest of his family that same day.

9

The victim clarified that he did not tell his aunt everything that had happened because he was scared of the defendant. Also, he did not tell his family members anything different from what he told his aunt, and he recalled telling them all about an offense that occurred in a truck. When a policeman arrived that evening, the victim told him everything, including the fact that the defendant had anally raped him. According to the victim, his family members were around him when he was talking to the policeman. A few days later, the victim spoke with Ms. Dufrene. Although Ms. Dufrene was a nice person, the victim testified that he did not feel comfortable talking to her.

On cross-examination, the victim was questioned more about the offense that occurred at Toledo Bend. The victim testified that he was sleeping in the bedroom and the defendant was sleeping in the living room. When he woke up and went into the living room, the defendant woke up and tried to make the victim perform oral sex. The victim explained:

> He [the defendant] woke up -- he work up and then he got up. And then he seen me, and then he tried to grab me and make me suck his thing. And -- . . . -- I slammed the door and took off running.

The victim stated that the defendant was wearing his clothes, but he could not recall when the defendant pulled down his pants. He remembered at trial that the defendant was wearing white and blue shorts, but he could not recall what he himself was wearing. The victim ran down the road where he encountered two ladies who were acquaintances of his grandmother. They brought him to where his grandmother was working. The victim stated he was scared, but he did not tell his grandmother what had happened. When he returned to his grandparents' home with his grandmother, the defendant threatened to cut him if he told anyone. The defendant was holding a box blade at the time.

10

When his parents arrived the next day, the victim did not tell them because he was scared. After he returned home to Cameron, he told his parents that something had happened. The victim did not recall what his parents did afterwards, and he did not remember talking to police officers. As a result of his accusation, he did not see his grandparents for a couple of years. He was about six years old when he saw them again. At that time, the victim was missing his grandmother and decided to tell his parents that the incident did not happen.

The victim started visiting his grandparents again who had moved to DeRidder. He went to see them almost every weekend, and he would spend the night. The victim's parents had also moved to DeRidder. During the first few years, nothing happened to the victim. His grandparents and his immediate family subsequently moved to Westlake. The victim frequently spent the night with his grandparents, and the sexual abuse began.

The victim recalled that while in Westlake, the defendant made him touch his penis. The victim explained that the defendant grabbed him as he was exiting the restroom and made the victim play with his penis. The defendant had a knife on his person and threatened to cut the victim if he did not stop moving. The defendant put the victim's hand on his penis. According to the victim, this was the first time he actually touched the defendant's penis. When confronted with the fact that he had not told Ms. Dufrene that he had touched the defendant's penis, the victim stated that he was scared, and he really did not know her.

On following day, the defendant approached the victim as he exited the restroom and instructed the victim to perform oral sex. The victim ran to his friend's house but did not tell the friend what had happened or anyone else; he was scared and "freaked out." Also, the victim confirmed that an incident had occurred in the defendant's truck. When asked why he did not tell Ms. Dufrene when given

11

the opportunity, he stated again that he was "freaked out" and did not want to tell Ms. Dufrene during his interview.

After his grandparents moved to Cameron, the victim stayed with them regularly, including times when his mother went oystering with his father. The victim testified that he was afraid to be alone with the defendant, and he tried to avoid being alone with him.

On one occasion, the defendant was sitting in his recliner and tried to grab the victim. The victim could not recall if the defendant exposed his penis or said anything when he tried to grab him. The victim ran to his aunt's house located next door. The victim did not tell his aunt what had happened because he was scared.

On another occasion, the defendant tried to get the victim to play with his penis, but the victim ran away. Although he reported to Ms. Dufrene that he threw something into the defendant's eyes, he did not recall same at trial. Also, he remembered running way, but he did not recall where he ran.

On another occasion, the defendant grabbed the victim and pulled his pants down. The victim hit the defendant in the head and ran outside. His cousin, Matthew, was outside at the time, but the victim did not tell him what had transpired.

The victim reiterated that he decided on his own to tell his aunt about the sexual abuse. The victim maintained that his mother was actually the second person he told. The victim did not agree with defense counsel that his decision to tell Ms. Dufrene about being anally raped was an afterthought. When asked why he waited until the end of his interview to report the offense, the victim stated that he did not want to talk about it at first and just decided to tell her. With regard to the offense, the victim testified that he was in the bedroom getting a video game

12

when the defendant grabbed him, got him down on the bed, and anally raped the victim. The victim did not see the defendant before he grabbed him. The victim testified that he struggled with the defendant. The victim did not recall what clothing either he or the defendant was wearing. Also, the victim did not remember if the defendant removed the victim's clothes or pulled his clothing down, and he did not know how long the offense lasted. The victim stated that he knew the defendant put his penis in his "butt" because he felt it. The victim testified that he did not remember what ended the offense. Lastly, the victim stated that this was the last offense that occurred.

The victim testified that he did not tell anyone other than his aunt that the allegations were not true. The victim also stated that he never voiced to anyone that his mother, aunt, or paternal grandmother told him to make the allegations against the defendant. The victim clarified that the defendant did not put his mouth on the victim's penis, but he had touched the defendant's penis.

On appeal, the defendant has limited his argument to the issue of whether or not an internal contradiction exists involving the victim's statement and his trial testimony. Accordingly, we will not discuss the remaining evidence as it is not relevant to the issue before this court. The defendant's argument rests solely on the fact that the victim recanted his allegations prior to trial, creating what the defendant maintains to be an internal contradiction.

The record clearly reflects that the victim recanted his allegations against the defendant just prior to trial. The victim testified, however, that he recanted his allegations because he thought the charges against the defendant had been dropped, and he wanted to re-establish a relationship with his grandmother. The victim's testimony was supported by his father's testimony regarding the first allegation of molestation involving the defendant and the victim when the victim was four or

13

five years old.  After having no contact with his grandmother for about two years, the victim was allowed to resume contact with his grandmother after he recanted the allegation.

The allegations made in victim's interview compared to the allegations described four years later in his trial testimony are similar, yet not identical, particularly regarding the issues of whether or not oral sex was involved or the defendant anally raped the victim with his penis.  On appeal, however, the defendant does not assert that the evidence was insufficient due to any inconsistencies in this evidence.  Moreover, even if the defendant had raised this issue on appeal, the jury's responsive verdicts indicate that the discrepancies between the victim's statement and testimony were considered by the jury.

Additionally, the defendant's assertion on appeal that there was no evidence to indicate any questionable action by the defendant against the victim is not an accurate statement.  In addition to the victim's statement and testimony, the jury considered evidence that the defendant's behavior following his arrest was unusual or suspect.  Detective Savoie testified that he received training and was experienced in interrogating suspects. He attended a total of three weeks of classes—a basic, intermediate, and advanced class—wherein he was taught how to properly interview suspects, witnesses, and victims of crimes and how to interpret possible deception and read emotions.  In this training, Detective Savoie learned to observe telltale signs of when someone was lying and to possibly detect deception.  Detective Savoie also attended a week of sex crime school involving juveniles as well as several seminars on sex crimes.

In the instant case, the defendant was arrested on June 14, 2006, after the victim's interview, for outstanding warrants from another jurisdiction, and he was subsequently brought to Detective Savoie's office for questioning about the

14

molestation allegations. To Detective Savoie's knowledge, the defendant had not yet been apprised of the accusations. The defendant was informed that he was a suspect in a molestation of a juvenile case, and the victim was identified. According to Detective Savoie, the defendant was very calm and did not appear to be upset about the accusations in any way. The defendant did not raise his voice or become angered. He appeared to Detective Savoie to be at ease with the situation. During the forty-five minute interview, the defendant was informed about the specific conduct of which he was accused, and he never got upset or raised his voice. He remained calm throughout the interview.

With suspects accused of a sex crime with a juvenile, Detective Savoie stated that he asks questions to elicit a response of some type. In the instant case, Detective Savoie asked the defendant if he ever molested the victim. The Defendant calmly responded, "No." When the defendant was asked what should happen to someone who would commit such an offense, he calmly responded, "They should be beat up and their penis should be removed." According to Detective Savoie, the defendant's response was appropriate, but there was no emotion behind his response. Additionally, Detective Savoie asked the defendant why he was being accused, and he stated that the victim's paternal grandmother was brainwashing him. When the defendant was asked who was molesting the victim, he stated that in his opinion, it was Alan, the victim's uncle.

Detective Savoie found the defendant unusually calm during the interview, and he deflected blame. Detective Savoie also found unusual the fact that when asked who molested the victim, the defendant deflected blame to another person. According to Detective Savoie, a more appropriate answer would have been, "I don't know" or that he did not know that the victim had been molested. Also, when asked why he was being accused, the defendant claimed that another person,

the victim's paternal grandmother, had brainwashed the victim. Lastly, Detective Savoie testified that the types of responses elicited from the defendant, such as deflection of blame, were the types he had been taught in class to identify in molestation cases.

We have reviewed the testimony of the victim and the record as a whole. Although there are some inconsistencies in the victim's testimony, they are not irreconcilable. He admitted to recanting and telling family members that nothing happened, but explained he did so in order to see his grandmother whom he missed. The jury had that testimony before it and made a credibility determination. We will not second-guess that determination.

Considering solely the testimony concerning incidents that occurred in Cameron Parish, and viewing that evidence in a light most favorable to the prosecution as in required by *Jackson*, we find sufficient evidence to support the defendant's convictions in Count 1, Docket #131,263, Attempted Aggravated Incest (responsive verdict to the charge of Aggravated Incest); Count 2, Docket #131,267, Attempted Molestation of a Juvenile (responsive verdict to the charge of Molestation of a Juvenile); Count 3, Docket #131,268, Attempted Molestation of a Juvenile (responsive verdict to the charge of Molestation of a Juvenile); and Count 6, Docket #131,272, Attempted Oral Sexual Battery.

We find insufficient evidence to support the allegations in Count 4, Docket #131,269, Attempted Molestation of a Juvenile (responsive verdict to the charge of Molestation of a Juvenile), and Count 5, Docket #131,271, Attempted Molestation of a Juvenile (responsive verdict to the charge of Attempted Oral Sexual Battery). Those two convictions and sentences are, therefore, vacated and set aside.

**ASSIGNMENT OF ERROR NUMBER ONE**

By this assignment of error, the defendant argues there is a serious deficiency in the record in that the neither the transcript, nor the minutes of *voir dire* contain either party's challenges for cause or peremptory challenges as to any of the prospective jurors. As such, the defendant contends that his constitutional right to an appeal based on a complete record of all evidence upon which the judgment was based was violated.

In support of his argument, the defendant refers to La.Code Crim.P. art. 843 which reads in pertinent part, "In felony cases, . . . the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

The defendant also cites *State v. Pinion*, 06-2346 (La. 10/26/07), 968 So.2d 131, wherein the questioning of the jury panels by the State, the defendant, and trial court were completely recorded and transcribed. The cause and peremptory challenges exercised during bench conferences that the parties assumed would be recorded and transcribed were not recorded due to unforeseen technical difficulties. In vacating the defendant's conviction and sentence, the court reasoned:

> As a general rule, the failure of the record to reflect the argument of counsel on objections, even when made in open court, does not affect a defendant's appeal because it does not hinder adequate review of the trial court's ruling. *State v. Johnson*, 438 So.2d 1091, 1104 (La.1983). Thus, the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant. *See*, *e.g.*, *Hoffman*, 98-3118 at 50-51, 768 So.2d at 587 (trial court cured any record problems "by summarizing substantive unrecorded conferences for the record"); *State v. Castleberry*, 98-1388, pp. 28-29 (La.4/13/99), 758 So.2d 749, 773 (three unrecorded bench conferences during direct examination of state witnesses had no discernible impact on the proceedings and the fourth concerned a mistrial motion by defense counsel, the basis of which was "easily ascertainable from the record" without regard to the unrecorded side-bar discussion); *State v. Deruise*, 98-0541, pp. 9-15

(La.4/3/01), 802 So.2d 1224, 1233-37 (failure to record bench conferences in which the prosecutor and defense counsel made their peremptory and cause challenges did not prejudice the appeal when the jury strike sheet was available for review and detailed the exercise of peremptory challenges by both sides and when the transcript of the voir dire revealed a substantial basis for denying a defense cause to the juror, even assuming that the challenge had been made but not preserved in the record;   remaining unrecorded bench conferences involved evidentiary matters that were otherwise addressed in the appeal, or involved matters of no discernible impact for which the defendant failed to demonstrate prejudice); *State v. Allen*, 95-1754, p. 11 (La.9/5/96), 682 So.2d 713, 722 (failure to record arguments at the bench concerning some of the defense peremptory challenges harmless when challenges for cause and arguments on the challenges were fully transcribed in the record and the minutes clearly reflected which jurors had been excused peremptorily and whether the state or defense had exercised the challenge).

On the other hand, in *State v. Landry*, 97-0499 (La.6/29/99), 751 So.2d 214, a combination of loud construction noise at the courthouse and audio recording problems on the part of the court reporter rendered the record grossly incomplete in several respects, including the failure to record peremptory strikes and challenges for cause made at the bench. *Landry*, 97-0499 at 1-2, 751 So.2d at 215. This Court reversed the defendant's capital conviction and sentence and remanded for a new trial because the deficiencies deprived the defendant of his constitutional right of appeal and judicial review. *Landry*, 97-0499 at 4, 751 So.2d at 216.   The Court thereby reaffirmed that "it is not the defendant's obligation to insure an adequate record . . . . it is the duty of the court . . . . to see that the court reporter makes a true, complete and accurate record of the trial." *Landry*, 97-0499 at 3, 751 So.2d at 216 (citing *American Bar Association Standards Relating to the Function of the Trial Judge*, § 2.5 (1972)).

In the present case, the trial court and not defense counsel had the duty to insure that the bench conferences involving jury selection were properly recorded because La.C.Cr.P. art. 795(B)(2) *required* that counsel for the state and defense exercise their peremptory challenges in side bar conferences out of the hearing of jurors, and further required that the court refrain from attributing the strikes to either side on the record when excusing the jurors. Counsel therefore could reasonably assume that the court had taken adequate steps to preserve the record of the side-bar conferences for appeal just as counsel could reasonably assume that the evidentiary portions of trial were also adequately recorded and preserved for review. Counsel could also reasonably assume that the court had discharged its correlative duty of insuring that the minutes of the proceedings would conform to the requirements for the lodging of appeals in criminal cases in the courts of appeal and this Court, and thus include a list of challenges for cause and peremptory challenges in addition to a list of

jurors selected to try the case. *See* La.S.Ct. Rule I, § 6(b); Rule 2-1.5(3) and (4), Uniform Rules Courts of Appeal.

Although the court of appeal faulted counsel for not making a general objection on the record to the composition of the jury, an objection that counsel had been forced to accept an obnoxious juror as the result of the trial court's erroneous ruling on one or more cause challenges has not been an aspect of the Court's jurisprudence for preserving error in the denial of cause challenges for over 50 years since *State v. Breedlove*, 199 La. 965, 7 So.2d 221 (1942) was legislatively superceded in the 1966 revisions to the Code of Criminal Procedure. *See State v. Robertson*, 92-2660 (La.1/14/94), 630 So.2d 1278, 1279-80. In jury selection, counsel satisfies the requirements of Louisiana's contemporaneous objection rule by stating his grounds for a cause challenge and then by removing the juror with one of his remaining peremptory challenges when the court declines to excuse the juror for cause. La.C.Cr.P. art. 841 ("It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take . . . and the grounds therefor.").

In this particular instance, by operation of art. 795(B)(2), bench conferences are a material part of the proceedings for purposes of La.C.Cr.P. art. 843 and their omission from the present case, given the reasonable likelihood that counsel exhausted his peremptory challenges, the uncertainty with respect to how many cause challenges the defense made unsuccessfully, and the absence of other contemporaneous records accounting for the selection process, *e.g.*, adequate minutes or jury strike sheets, requires reversal of defendant's conviction and sentence. *State v. Ford*, 338 So.2d 107 (La.1976) (reversal required in second degree murder case in which record missing the testimony of four state witnesses and the voir dire of prospective jurors); *compare State v. Goodbier*, 367 So.2d 356 (La.1979) (absence of voir dire transcript from the record did not compromise defendant's appeal when affidavit of the court report indicated that counsel failed to exhaust his peremptory challenges).

*Id.* at 134-36.

Lastly, the defendant refers to this court's decision in *State v. Spears*, 08-831 (La.App. 3 Cir. 3/4/09), 8 So.3d 119, wherein the defendant argued that the record was so deficient in some areas that it deprived him of his right to appeal. With regard to *voir dire*, the defendant asserted that portions of the *voir dire* transcript referred to the individual venire members as "prospective juror" rather than by name, and a number of comments and statements made throughout the *voir dire*

were listed as "inaudible." Further, the defendant asserted that the record was unclear whether he used all of his peremptory challenges during *voir dire*. The minutes indicated he used only eleven of his peremptory challenges, whereas at the hearing on his motion for a new trial, the defendant stated he had used all of them. The *voir dire* transcripts did not provide information regarding the parties' peremptory challenges, but the jury strike sheets showed he had used all of his peremptory challenges.

The *Spears* court distinguished the facts in *Pinion*, 968 So.2d 131, from those in *State v. Campbell*, 06-286 (La. 5/21/08), 983 So.2d 810, *cert. denied*, 555 U.S. 1040, 129 S.Ct. 607 (2008), wherein the supreme court denied relief to the defendant who claimed he was prejudiced by omissions from the *voir dire* transcript. The *Spears* court found that the *Campbell* opinion clearly contained more detail than was available in *Pinion*, including detailed discussion of the *voir dire* examinations of various named jurors or potential jurors. In *Spears*, the court was troubled by the fact that the discussions of the jury challenges did not appear in the record and concluded that the record did not contain enough information for the defendant to effectively challenge the denials of his challenges for cause. The court reasoned "any attempt at argument or review would require identification of Defendant's unrecorded causal challenges, and reconstruction of both the reasons supporting them and the reasons for the trial court's denial of them." *Spears* 8 So.3d at 122.

In the instant case, after the record was lodged in this court, the defendant moved to supplement the record with a transcription of bench conferences held during *voir dire*. On August 24, 2011, this court ordered the court reporter to transcribe the bench conferences or to indicate by affidavit that the bench conferences were not recorded. The clerk of court was then ordered to supplement

the record with same. A supplemental record was received in this court containing an affidavit of court reporter Roxane D. Boudoin, wherein she stated:

> there were multiple bench conferences held during the *voir dire*; that the microphones were on, but that the bench conferences were not audible due to the parties whispering; further the microphone system available at the 38th Judicial District Court is not sensitive enough to audibly record bench conferences.

A second supplemental record received in this court contained an affidavit of minute clerk Delaine Theriot, wherein she stated:

> there were multiple bench conferences held during voir dire; that she was not able to hear the bench conferences concerning challenges for cause; that she does not have any evidence or documents relating to the challenges for cause; that she does not have any evidence or documents relating to any peremptory challenges because neither the State or defendant's attorney made or filed any peremptory challenges.

A review of the record reflects that the entire colloquy between the trial court, the respective attorneys, and prospective jurors was transcribed, and the identity of each juror is readily apparent. Several bench conferences during *voir dire*, however, were not transcribed and according to the court reporter, were not recorded. The *voir dire* transcript indicates that forty-one prospective jurors were called, eight of which were excused by the trial court for cause and with reasons stated. Nineteen of the prospective jurors were excused following bench conferences. Neither the transcript nor the minutes of *voir dire* indicate which party made the challenges, what grounds upon which the challenges were made, or the trial court's reasons for its rulings. Additionally, the minutes do not detail any peremptory challenges, only that certain jurors were challenged for cause, excused for cause, or excused.

The state stresses on appeal that the defendant must establish he was prejudiced by the missing portions of the transcript, rather than asking this court to assume prejudice. *State v. Boatner*, 03-485 (La. 12/3/03), 861 So.2d 149. In

further support of its argument, the state refers to *State v. Williams*, 06-1327 (La.App. 4 Cir. 1/23/08), 977 So.2d 160, *writ denied*, 08-413 (La. 10/24/08), 992 So.2d 1033, wherein the court found that the defendant was not prejudiced on appeal due to the absence of transcribed bench conferences regarding the jury *voir dire*. The court noted:

> as in [*State v.*] *Deruise* [, 98-541 (La. 4/3/01), 802 So.2d 1224], the transcript of *voir dire* includes the questioning of each prospective juror, from which it can be determined if there was a basis for any challenges for cause that the defense may have brought and may have been denied by the trial court, thereby causing the defense to exercise a peremptory challenge for a juror. A reading of the transcript of *voir dire* shows that there was no basis to excuse for cause any of the jurors who ultimately served on the jury or those whom the appellant had to excuse peremptorily.

*Id*. at 176. The court also observed that the record contained detailed jury sheets that indicated the peremptory strikes for each party as well as jurors excused for cause.

Unlike the facts before this court in *Spears*, 8 So.3d 119, the *voir dire* transcript contains detailed discussion of the *voir dire* examinations, including all of the questions posed by the trial court and parties and the responses of the each prospective juror. Additionally, the defendant does not identify a specific juror or jurors who should not have been seated based on the information available in the *voir dire* transcript. Accordingly, we find the defendant has not established he was prejudiced by the missing transcriptions of bench conferences during *voir dire*.

## CONCLUSION

The defendant's convictions in Docket #131,263, Attempted Aggravated Incest; Docket #131,267, Attempted Molestation of a Juvenile; Docket #131,268, Attempted Molestation of a Juvenile, and; Docket #131,272, Attempted Oral Sexual Battery are affirmed. The defendant's convictions in Docket #131,269,

Attempted Molestation of a Juvenile, and Docket #131,271, Attempted

Molestation of a Juvenile, are vacated and set aside.

**CONVICTIONS FOR ATTEMPTED AGGRAVATED INCEST, TWO COUNTS OF ATTEMPTED MOLESTATION OF A JUVENILE, AND ONE COUNT OF ATTEMPTED ORAL SEXUAL BATTERY AFFIRMED. CONVICTIONS AND SENTENCES FOR TWO COUNTS OF ATTEMPTED MOLESTATION OF A JUVENILE VACATED AND SET ASIDE, AND JUDGMENTS OF ACQUITTAL ENTERED.**

STATE OF LOUISIANA

VERSUS

L. W.

PETERS, J., concurring in part and dissenting in part.

As pointed out in the majority opinion, the state charged the defendant with eight separate counts of sexual offenses against B.D.  The jury found the defendant not guilty on two of the three counts of aggravated incest and returned a responsive verdict of attempted aggravated incest on the remaining count.  In addressing the three counts of molestation of a juvenile, the jury returned responsive verdicts of attempted molestation of a juvenile on each count.  Finally, the jury found the defendant guilty of the two counts of attempted oral sexual battery.  Thus, of the eight original counts, the jury found the defendant not guilty of two and returned responsive verdicts on four of the remaining six.  The majority finds that the jury erred in finding the defendant guilty of one of the three counts of attempted molestation of a juvenile and of one of the counts of attempted oral sexual battery.  The effect of the majority's conclusion is to reduce the convictions to one count of attempted aggravated incest, two counts of attempted molestation of a juvenile, and one count of attempted oral sexual battery.

I agree with the majority's determination that the state failed to carry its burden of proof on the two counts of attempted molestation of a juvenile and one count of attempted oral sexual battery.  However, I respectfully disagree with the majority's conclusion that the jury did not err in concluding that the state

established beyond a reasonable doubt that the defendant committed the remaining offenses. I would vacate all of the convictions and sentences and would render not guilty verdicts on all counts.

In reaching the conclusion that these convictions should be set aside, I fully recognize the heinous nature of these offenses. A civilized society deplores any acts of harm done to children and punishes the offender in the strongest possible way. Still, we must also recognize that the state's burden is to prove the elements of the offense or offenses beyond a reasonable doubt and that mere accusations are not sufficient to carry that burden.

> The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.

*In re Winship*, 397 U.S. 358, 363-64, 90 S.Ct. 1068, 1072 (1970).

I fully agree with the majority's position in reference to the *Jackson* standard of review. That is to say that we must view the evidence presented in the light most favorable to the prosecution and that we should not second guess credibility determinations by the jury beyond the sufficiency evaluations required under the *Jackson* standard of review. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Kinnerson*, 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367. However, in reviewing the evidence, we must consider the entire evidentiary record and not just isolated portions. We do so because "a *rational* trier of fact would consider all of the evidence." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988).

2

I also agree that as a general rule, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the factfinder, is sufficient to support a conviction. *State v. H.L.J.*, 08-1070 (La.App. 3 Cir. 4/1/09), 6 So.3d 997. In fact, this limited evidence is sometimes sufficient even if the state fails to introduce medical, scientific, or physical evidence to prove the commission of the offense. *Id.*

In the matter now before us, the defendant's guilt or innocence depends solely on the believability of B.D. Unfortunately, the evidentiary record not only does not contain any medical,[1] scientific, or physical evidence to support his allegations, it contains no corroborating evidence of any kind. It does, however, contain the testimony of at least six individuals, who were told by B.D. at different times over a period of more than four and one half years between the initial allegations in June of 2006 and the trial on the merits held in December of 2010, that his allegations against the defendant were fabricated. It further contains testimony from everyone except B.D. that he never exhibited any external signs of stress before or after the allegations were made. On the contrary, all those who testified concerning B.D.'s demeanor, before and after the reported allegations, asserted that the relationship between him and the defendant was very close and that B.D. always appeared comfortable in the defendant's presence.

Because the individuals testifying to B.D.'s subsequent statements did not report their conversations to law enforcement authorities, one might simply ignore these assertions. However, B.D. admitted in his trial testimony that he had recanted his allegations on a number of occasions. Specifically, he testified that he

---

[1] A physician's examination of B.D., conducted at the request of the Cameron Parish Sheriff's Office on July 26, 2006, or forty-three days after his interview with Ms. Dufrene, revealed no evidence of sexual activity.

did inform D.A.D., the defendant's sister-in-law, that the defendant never did anything to harm him, and that he told a number of people the same thing on his return from Indiana. His reason for recanting the allegations was partly because he thought the charges had been dropped and partly because he wanted to reestablish a relationship with his grandmother.[2]

B.D.'s testimony contains so many internal contradictions and irreconcilable conflicts that a rational trier of fact could not conclude that this testimony, standing alone, was sufficient to establish beyond a reasonable doubt that the defendant committed the offenses for which he was convicted. Thus, I would vacate the convictions and sentences and render not guilty verdict on all counts.

---

[2] Reestablishing a relationship with his grandmother was the same reason given for recanting the Sabine Parish allegations some ten years before trial on the offenses now before us and some four years before the making of the allegations giving rise to this prosecution.

4