Judgment rendered February 11, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,679-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Plaintiff-Appellee

versus

DEVIN OWEN PORTER, JR.                      Defendant-Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 394,551

Honorable Christopher T. Victory, Judge

* * * * *

| | |
|---|---|
| LOUISIANA APPEALS & WRIT SERVICE By: Sherry Watters | Counsel for Defendant-Appellant |
| DEVIN OWEN PORTER, JR. | Pro Se |
| JAMES E. STEWART, SR. District Attorney | Counsel for Plaintiff-Appellee |
| TOMMY JAN JOHNSON WILLIAM JACOB EDWARDS Assistant District Attorneys | |

* * * * *

Before HUNTER, MARCOTTE, and ELLENDER, JJ.

**HUNTER, J.**

Defendant, Devin Owen Porter, Jr., was charged by bill of indictment with one count of second degree murder, in violation of La. R.S. 14:30.1, six counts of attempted second degree murder, in violation of La. R.S. 14:30.1 and 14:27, and one count of aggravated flight from an officer, in violation of La. R.S. 14:108.1(C). Following a trial, a unanimous jury found defendant guilty as charged. He was sentenced to serve life in prison at hard labor without the benefit of probation, parole, or suspension of sentence for the murder conviction, 40 years at hard labor without the benefit of probation, parole, or suspension of sentence for each attempted second degree murder conviction, and five years at hard labor for the aggravated flight conviction. The sentences were ordered to be served concurrently with each other.

## FACTS

On March 25, 2023, a gray four-door sedan stopped near the intersection of Market and Texas Streets in Shreveport, Louisiana. Two men, armed with assault weapons, exited both rear doors of the vehicle, and fired at least 57 shots into a crowd of people, killing Jacorvin Taylor and wounding six bystanders.[1] During the incident, the driver of the vehicle briefly opened the door of the vehicle but did not exit. After firing the weapons for approximately 30 seconds, the gunmen returned to the vehicle.[2]

---

[1] Jacorvin Taylor suffered a single gunshot wound to his right flank; the bullet traveled through his liver and entered his heart. Tacara Mandigo suffered a gunshot wound to the stomach; JaCrystal Warner was shot in the back of her leg and hip; Albert Johnson was shot in the buttocks; Cameron Thompson suffered gunshot wounds to the jaw/chin, left hip, and left hand; and Artisha Davis was shot in the back of her left leg. Willis Crowder was also shot; however, his injuries were not specified the record. One of the detectives testified he believed Crowder was "shot in his face area."

[2] The evidence revealed that three firearms were fired from the suspect vehicle. During the trial, the State asserted the passenger in the front seat of the vehicle fired a gun from the other side of the vehicle; however, the third shooter was not visible in the video footage.

The driver waited for the shooters to return to the vehicle and quickly fled the scene. One of the gunmen was wearing a dark puffy jacket and dark jogging pants with white stripes and appeared to be firing a Joe Bob Outfitter AR pistol with a 60-round capacity drum magazine.[3]

The mass shooting was captured on security cameras from a nearby apartment complex. Officers of the Shreveport Police Department ("SPD") were working extra shifts providing security at some of the bars in downtown Shreveport. Officers Colin York and Keith O'Neal responded to the gunshots and aided the victims. Emergency medical personnel arrived on the scene but attempts to resuscitate Taylor were unsuccessful. None of the surviving victims, law enforcement officers, or eyewitnesses were able to positively identify any of the gunmen.

Approximately 10 minutes after the shooting, Officer Christopher Davidson, an SPD patrol officer, was stopped in a parking lot at the intersection of Hearne and Midway Avenues when he noticed a silver four-door Hyundai Elantra with a broken rear window. Officer Davidson was aware that breaking a rear window was a typical method of gaining entry into a vehicle during a vehicle burglary. Therefore, he conducted a check of the license plate and learned the vehicle had been reported stolen. The officer activated the lights and siren of his marked police unit and attempted to initiate a traffic stop.

By this time, defendant, Devin Owen Porter, Jr., was driving the stolen vehicle. Defendant refused to stop, and other marked SPD police

---

[3] Fifty-seven shell casings were recovered from the crime scene. Of the 57 shell casings, 31 matched a Joe Bob Outfitters weapon. It was also discovered that all of the casings found at the scene of the mass shooting and at the scene of defendant's arrest matched the three weapons retrieved from the vehicle.

units soon joined the pursuit. Ultimately, the high-speed chase spanned more than 11 miles. During the pursuit, defendant ran multiple traffic lights, and his speed exceeded 100 miles per hour at intervals. At several points, the vehicle left the roadway and drove through some yards of residences along the way. The chase ended when defendant hit a culvert and crashed the vehicle into a ditch. After the crash, one of the rear seat passengers of the vehicle aimed an assault rifle at the police officers. Officer Nathaniel Davis rammed his police vehicle into the pursued vehicle, forcing the suspect to drop the weapon. Thereafter, defendant and the other suspects exited the vehicle and fled on foot. Defendant was captured a short distance away. When he was apprehended, defendant was wearing a black puffy jacket and dark (blue) jogging pants with white stripes, which was similar to the clothing worn by one of the assailants in the Market/Texas Street shooting.

During the subsequent search of the vehicle and the area nearby, the police officers found three assault weapons, one Joe Bob Outfitters assault weapon and two Anderson Manufacturing AR pistols.[4] Three shell casings were found on the windshield of the vehicle, and blood was discovered in the back seat.[5]

---

[4] The body camera footage of the pursuit, defendant's arrest, and the search of the vehicle was admitted into evidence at trial.

[5] Later that morning, Zyun Thomas presented to a local hospital suffering from a gunshot wound to the hip. A detective went to the hospital to interview Thomas, and the clothing Thomas was wearing on the night of the shooting was taken into evidence. Subsequent DNA testing revealed the blood found in the back seat of the stolen Hyundai belonged to Thomas, and his DNA was found one of the firearms retrieved from the car. A warrant was issued for Thomas' arrest, and he was later apprehended. During the trial, the State maintained that Thomas was shot when an unidentified shooter returned fire using a 9 mm firearm.

Defendant became a suspect after detectives investigating the mass shooting learned of the high-speed pursuit and obtained a description of defendant's clothing and the weapons and blood found in the vehicle. Subsequent ballistics testing revealed the bullet that struck Jacorvin Taylor matched one of the weapons retrieved during the search of the vehicle defendant was driving and the area nearby. Photographs obtained from defendant's cellular phone also showed defendant and another person posing with a Joe Bob Outfitter AR pistol.

Defendant was charged by bill of indictment with one count of second degree murder, in violation of La. R.S. 14:30.1, six counts of attempted second degree murder, in violation of La. R.S. 14:30.1 and 14:27, and one count of aggravated flight from an officer, in violation of La. R.S. 14:108.1(C). Following a trial, a unanimous jury found defendant guilty as charged. Thereafter, the trial court denied defendant's motion for post-verdict judgment of acquittal.

Defendant was sentenced to serve life in prison without the benefit of probation, parole, or suspension of sentence for the murder conviction, 40 years at hard labor without the benefit of probation, parole, or suspension of sentence for each attempted second degree murder conviction, and five years at hard labor for the aggravated flight conviction. The sentences were ordered to be served concurrently with each other.[6] Defendant's motion to reconsider sentence was denied.

---

[6] In a separate indictment, defendant was also charged with aggravated criminal damage to property, illegal use of a weapon, illegal possession of stolen things, and aggravated obstruction of a highway. After sentencing, the State agreed to dismiss those charges as they arose from the same incident(s), and the sentences imposed in the instant matter "adequately penalizes all the charges[.]"

4

Defendant appeals.

## DISCUSSION

Defendant contends the evidence was insufficient to support his convictions for second degree murder and attempted second degree murder. He argues the State did not meet its burden of proving his identity as one of the shooters and failed to negate the possibility of misidentification.[7] Defendant maintains none of the witnesses identified him as a shooter or as a participant in the incident, and the State did not introduce any evidence to establish that he was downtown when the shooting occurred. According to defendant, the State "invited jury speculation and guilt by association" as a substitute for evidence of identity.[8]

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124

---

[7] Defendant argues that the jury was improperly instructed as to the State's burden of proving identity in cases where the evidence is circumstantial. We note that defense counsel failed to contemporaneously object to the trial court's jury instructions. When presented with the jury charges, defense counsel stated on the record, "Defense is agreeable." Consequently, the failure to contemporaneously object to the jury instructions constitutes a waiver of the issue on appeal. *See*, La. C. Cr. P. art. 801(C); La. C. Cr. P. art. 841.

[8] Defendant asserts reasonable doubt was evident because during deliberations, the jury asked to see the video of the shooting again. The jury also posed several questions regarding the evidence. The trial court allowed the jury to re-watch the video of the shooting and re-read the instructions pertaining to the definition of second degree murder and the responsive verdicts thereto. However, the court declined to respond to the questions regarding the testimony and evidence presented, stating, "The evidence is closed in this case, and I can't comment on the evidence."

S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now codified in La. C. Cr. P. art. 821, does not afford the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Johnson*, 55,254 (La. App. 2 Cir. 8/9/23), 370 So. 3d 91.

Appellate courts neither assess the credibility of witnesses nor reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422. Where there is conflicting testimony concerning factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writ denied*, 02-2595 (La. 3/28/03), 840 So. 2d 566, *writ denied*, 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert. denied*, 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed 2d 90 (2004).

Further, the rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. All the evidence, both direct and circumstantial, must meet the *Jackson* reasonable doubt standard to support a conviction. *State v. Jacobs*, 504 So. 2d 817 (La. 1987); *State v. Copes*, 566 So. 2d 652 (La. App. 2 Cir.1990).

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A). Any person who, having a specific intent to commit a crime,

does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.  La. R.S. 14:27(A).

Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10. Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant.  *State v. Graham*, 420 So. 2d 1126 (La. 1982).  Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person.  *State v. Seals*, 95-0305 (La. 11/25/96), 684 So. 2d 368.  It may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries.  *State v. Jackson*, 55,312 (La. App. 2 Cir. 11/15/23), 374 So. 3d 354.

When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.  Positive identification by one eyewitness or victim may suffice to support a conviction.  *State v. Grant*, 55,722 (La. App. 2 Cir. 8/28/24), 399 So. 3d 716; *State v. Hughes*, 05-0992 (La. 11/29/06), 943 So. 2d 1047.  It is the factfinder who weighs the respective credibility of the witnesses, and this Court will generally not second-guess those determinations.  *Id*.

A person may be convicted of an offense even if he has not personally fired the fatal shot.  *State v. Frost*, 53,312 (La. App. 2 Cir. 3/4/20), 293 So. 3d 708, *writ denied,* 20-00628 (La. 11/18/20), 304 So. 3d 416.  The law of

7

principals states that all persons involved in the commission of a crime are equally culpable.  A principal may be connected to those crimes for which he has the requisite mental state.  *State v. Brooks*, 42,226 (La. App. 2 Cir. 8/15/07), 962 So. 2d 1220.  The determination of whether the requisite intent is present in a criminal case is for the trier of fact.  *State v. Jones*, 49,396 (La. App. 2 Cir. 11/19/14), 152 So. 3d 235.  *State v. Smith*, 49,839 (La. App. 2 Cir. 5/20/15), 166 So. 3d 416, *writ denied*, 15-1244 (La. 6/3/16), 192 So. 3d 753.

As the defendant points out, the victims and witnesses were unable to positively identify him as one of the shooters.  Mary Allen, the sole eyewitness to testify at trial, stated she was a passenger in a vehicle which was stopped at a red light near the scene of the shooting.  She stated she did not see the assailants exit the vehicle; she "just [saw] them with guns." Allen further testified that she saw four people standing outside of the suspect vehicle, and one of them was wearing "all black . . . with a hood on," one of the shooters was wearing "a little colorful-looking jacket," and "the rest of them had, like, hoods on."  She also testified that she saw one of the assailants shooting a gun; and she observed "two of them with rifles." During her testimony on cross-examination, Allen testified, "I saw two shooters shooting, but I didn't get the exact to how they looked."  She stated she did not see the assailants exit or reenter the vehicle, and they were wearing "hoods," but not masks.[9]

To prove defendant's identification, the State offered the video surveillance footage obtained from the scene of the shooting, and the police

_____

[9] A mask containing defendant's DNA was found along the path he ran after he crashed the vehicle. The mask was introduced into evidence at trial.

officers' dash camera and body camera footage from the high-speed chase, the search of the vehicle, and defendant's arrest. The surveillance footage depicted a gray vehicle driving up and coming to a stop. Two shooters were seen exiting the vehicle from the rear doors and firing a barrage of shots from assault weapons. One of the shooters was wearing a dark puffy jacket and dark jogging or athletic pants with white stripes on the sides of the legs. After the shooting ended, that particular shooter reentered the back seat on the passenger side of the vehicle. The driver of the vehicle was seen opening the door but did not exit the vehicle; the driver waited for the shooters to return to the vehicle before speeding away, and ten minutes later, Officer Davidson encountered the gray vehicle on Hearne Avenue. By this time, defendant, wearing clothing identical to the clothing worn by the person seen entering the rear passenger door in the video, was driving the vehicle.

Numerous police officers involved in the high-speed pursuit and the investigation of the mass shooting testified as to the events that transpired. Officer Davidson testified he was in a marked police vehicle parked at the intersection on Hearne Avenue when he observed a silver Hyundai Elantra with its right rear window broken. He stated he began to follow the vehicle and ran the license plate to confirm that the vehicle had been stolen. He notified dispatch and other officers in the area and activated his police lights and siren to initiate a traffic stop. However, the vehicle fled, and he pursued the vehicle through a residential area, driving through yards and fields.

Officer Davidson stated he was unable to execute a turn, and Officer Nathaniel Davis became the primary police unit in the pursuit.[10]

Officer Davis testified that he received a call to assist with a pursuit of a stolen vehicle. He stated he activated his lights and siren of his marked police vehicle and joined the pursuit. Officer Davis stated that he became the primary vehicle after Officer Davidson was unable to execute a turn. He testified that he followed the suspect vehicle down a dead-end street; after driving through the backyards of residences, the vehicle went into a ditch and came to a stop. According to Officer Davis, after the vehicle came to a stop, the doors of the vehicle opened, and "the back left passenger then pointed a rifle at myself and Officer Stevenson." He testified that he feared for his life, therefore, he used the marked patrol unit to "ram the vehicle in order for that suspect to drop his weapon." The assailant dropped the gun, crawled through the car, exited the passenger side of the vehicle, and fled on foot. Officer Davis testified that all four suspects fled from the vehicle, three from the passenger side, and one from the driver's side.[11] He stated he pursued the suspect that emerged from the front seat of the driver's side. Ultimately, the suspect tripped and fell, and he was able to arrest him.

During cross-examination, Officer Davis reiterated he only pursued the suspect who fled from the driver's side of the vehicle. He admitted that it was dark, but he never lost sight of defendant. He confirmed defendant was the same person who exited the driver's side front door. Officer Davis also testified that none of the other suspects that emerged from the vehicle

---

[10] Officer Davidson did not arrive on the scene of the crash until after defendant had been arrested.

[11] This testimony contrasted with the testimony of Officer Stevenson, who testified two suspects fled from the passenger side, and two fled from the driver's side.

were wearing clothing identical to what defendant was wearing. He specifically recalled that the person who aimed the gun at them was wearing red pants with a white stripe and "colorful underwear." He also stated he vaguely remembered seeing one of the suspects wearing a yellow hoodie.

Officer Dominique Stevenson, who was training and riding in the vehicle with Officer Davis, also testified. She confirmed that one of the men in the vehicle aimed a firearm at her and Officer Davis, and the person who pointed the gun was not defendant.[12] Officer Stevenson testified she did not notice what clothing the other suspects were wearing.

Detective Gilbert Monereau testified defendant's cell phone records revealed photographs of defendant holding a black AR-15 pistol with blue foregrips, and he recognized the firearm (with the drum magazine) as the same weapon recovered from the vehicle after defendant's arrest. Detective Monereau also testified that he studied the video footage of the shooting and observed that a person exited rear passenger door of the gray vehicle, armed with a firearm, was wearing dark pants with white stripes and a black puffy jacket. Communications with other officers after the vehicle chase and crash revealed the suspect apprehended was wearing a black puffy jacket and dark pants with white stripes. The detective further testified that he listened to recordings of defendant's jailhouse telephone calls, and during calls, defendant told his mother, "My gun was legal." He testified defendant's statement led him to believe that one of the guns retrieved from the vehicle belonged to defendant.

---

[12] Officer Stevenson testified she became entangled in the seatbelt, had difficulty exiting the vehicle, and did not join in the pursuit of the suspects. She stated she caught up with Officer Davis as he was placing defendant in handcuffs.

11

The State also introduced evidence of the three assault weapons retrieved from the vehicle defendant was driving. One of the firearms was a Joe Bob Outfitters, and two were Anderson Manufacturing AR pistols. Additionally, a drum magazine, with a 60-round capacity, was recovered from the vehicle. Most of the shell casings recovered from the scene of the shooting (31 out of 57) were fired from Joe Bob Outfitters assault weapon, and the bullet retrieved from Jacorvin Taylor's body was also fired from the Joe Bob Outfitters. Further, the Joe Bob Outfitters weapon was featured in photographs recovered from defendant's cellphone and social media account.[13]

After reviewing the record, we conclude that, based on the totality of the circumstantial evidence and testimony, a jury could reasonably find, beyond a reasonable doubt, that defendant was the person that exited the vehicle, wearing the dark jacket and jogging pants with white stripes, and fired shots into the crowd. After reviewing this record in its entirety, we cannot say that the evidence in this case does not support the jury's verdict. When viewed in the light most favorable to the prosecution, we find the evidence presented herein was sufficient to support the jury's determination that defendant was a principal to the crime of the second degree murder of Jacorvin Taylor, of the attempted second degree murder of the other victims, and of aggravated flight from a police officer.

Defendant concedes the life sentence for second degree murder is mandated by statute. Nevertheless, he argues the trial court was still

---

[13] The State also introduced into evidence two face masks. One of the masks was found along the path of defendant's flight on foot after the vehicle crash, and the other was found in the back seat of the vehicle. The mask found along the path contained defendant's DNA, and the mask found in the vehicle contained Zyun Thomas' DNA.

obligated to consider the factors set forth in La. C. Cr. P. art. 894.1, and the court failed to do so. Defendant also contends the 40-year sentences imposed for attempted second degree murder are excessive. He asserts he was 19 years old at the time of the shooting and 21 years old when he was sentenced. He further argues none of the surviving victims were seriously injured, two of them did not appear to testify at trial, and none of them appeared at the sentencing hearing. Defendant also argues the trial court imposed near-maximum sentences for attempted second degree murder without any justification for doing so.[14]

Appellate courts employ a two-prong test when reviewing an excessive sentence claim: (1) the trial record must demonstrate that the trial court complied with the guidelines in La. C. Cr. P. art. 894.1 (list of sentencing factors); and (2) the appellate court must determine if the sentence is constitutionally excessive. *State v. Davis*, 56,118 (La. App. 2 Cir.

---

[14] Defendant also appears to assert (but did not assign as error) a claim for ineffective assistance of counsel by arguing his trial counsel "did nothing to assist him at sentencing." He asserts counsel did not develop any information regarding defendant's social history, lack of criminal history, education, employment, or family support, and he failed to file a sentencing memorandum or request a downward departure.

To establish that his attorney was ineffective, a defendant must show that counsel's performance was deficient, and that this deficiency prejudiced his defense. *State v. James*, 55,866 (La. App. 2 Cir. 11/20/24), 400 So. 3d 1263; *State v. Hilliard*, 52,652 (La. App. 2 Cir. 8/14/19), 278 So. 3d 1065, *writ denied*, 19-01701 (La. 7/24/20), 299 So. 3d 68. The defendant must show that, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Fields*, 55,448 (La. App. 2 Cir. 1/10/24), 379 So. 3d 244.

In the instant case, defendant has not set forth any facts in support of any of his allegations. As such, his claim of ineffective assistance of counsel will be more appropriately addressed in an application for post-conviction relief in the trial court, where a full evidentiary hearing can be conducted, rather than on direct appeal, since the instant record does not contain sufficient evidence for this Court to rule on the merits of such a claim. *See*, *State v. LaCaze*, 99-0584 (La. 1/25/02), 824 So. 2d 1063, *cert. denied*, 537 U.S. 865, 123 S. Ct. 263, 154 L. Ed. 2d 110 (2002); *State v. Deruise*, 98-0541 (La. 4/3/01), 802 So. 2d 1224, 1248, *cert. denied*, 534 U.S. 926, 122 S. Ct. 283, 151 L. Ed. 2d 208 (2001); *State v. Cannon*, 55,708 (La. App. 2 Cir. 10/2/24), 399 So. 3d 853. This assignment of error is without merit.

2/26/25), 408 So. 3d 1086, *writ denied*, 25-00332 (La. 4/29/25), 407 So. 3d 624; *State v. Sanders*, 54,261 (La. App. 2 Cir. 3/9/22), 335 So. 3d 527. Articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. *State v. Duncan*, 53,194 (La. App. 2 Cir. 1/15/20), 290 So. 3d 251. Important elements to be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and likelihood of rehabilitation. *State v. Jones*, 398 So. 2d 1049 (La. 1981); *State v. DeBerry*, 50,501 (La. App. 2 Cir. 4/13/16), 194 So. 3d 657, *writ denied*, 16-0959 (La. 5/1/17), 219 So. 3d 332. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. *State v. Shipp*, 30,562 (La. App. 2 Cir. 4/8/98), 712 So. 2d 230.

If the record supports the sentence imposed, the appellate court shall not set aside a sentence for excessiveness. *Id*. There is no requirement that specific matters be given particular weight at sentencing. *State v. DeBerry*, *supra*; *State v. Shumaker*, 41,547 (La. App. 2 Cir. 12/13/06), 945 So. 2d 277, *writ denied*, 07-0144 (La. 9/28/07), 964 So. 2d 351.

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Kennon*, 19-0998 (La. 9/1/20), 340 So. 3d 881; *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So. 2d 672; *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980); *State v. Bell*, 53,712 (La. App. 2 Cir. 1/13/21), 310 So. 3d 307; *State v. Jackson*, 51,575 (La. App. 2 Cir. 9/27/17),

244 So. 3d 764. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. DeBerry*, *supra*; *State v. Modisette*, 50,846 (La. App. 2 Cir. 9/28/16), 207 So. 3d 1108. As a general rule, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. *State v. Cozzetto*, 07-2031 (La. 2/15/08), 974 So. 2d 665; *State v. Gibson*, 54,400 (La. App. 2 Cir. 5/25/22), 338 So. 3d 1260, *writ denied*, 22-00978 (La. 3/7/23), 356 So. 3d 1053.

Trial courts have wide discretion in the imposition of sentences within the statutory limits, and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Trotter*, 54,496 (La. App. 2 Cir. 6/29/22), 342 So. 3d 1116; *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Bell*, *supra*; *State v. Burns*, 53,920 (La. App. 2 Cir. 6/30/21), 322 So. 3d 928.

Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. La. R.S. 14:31. The sentencing range for attempted second degree murder is 10-50 years at hard labor without the benefit of probation, parole, or suspension of sentence. La. R.S. 14:31 and 14:27(D)(1)(a). Further, whoever commits the crime of aggravated flight from an officer shall be imprisoned at hard labor for not more than five years.

Prior to imposing sentence, the trial court heard victim impact statements from Maria Jack and Olivia Taylor, the mother and sister of Jacorvin Taylor. Ms. Jack provided a statement detailing the "tragic void" created by the death of her son, and she described her difficulty coping with his death. Ms. Taylor vividly explained the impact her brother's murder has had on her family, and she informed the court that Mr. Taylor had a young son, whose father was heartbreakingly taken away from him.

The trial court considered the factors set forth in La. C. Cr. P. art. 894.1, as well as aggravating and mitigating circumstances. The court noted that defendant "opened fire with an AR pistol at a large group of people on a street in downtown just a few feet from a crowded nightclub *** killing one and seriously wounded six others." The court specifically found that defendant used actual violence, and his actions manifested deliberate cruelty to the victims. The court also reviewed mitigating factors and found that none apply in this case. The court imposed the mandatory sentence of life in prison at hard labor without the benefit of probation, parole, or suspension of sentence for the second degree murder conviction, and 40 years at hard labor without the benefit of probation, parole, or suspension of sentence for each of the attempted second degree murder convictions. The court further sentenced defendant to the maximum sentence of five years at hard labor for conviction for aggravated flight from an officer. He ordered the sentences to run concurrently "based on the fact that these are all committed, arise out of the same series of events."

Where there is a mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. *State v. Cannon*, 55,847 (La. App. 2 Cir. 10/2/24), 400

16

So. 3d 1085, *writ denied*, 24-01325 (La. 5/20/25), 409 So. 3d 221; *State v. Burd*, 40,480 (La. App. 2 Cir. 1/27/06), 921 So. 2d 219, *writ denied*, 06-1083 (La. 11/9/06), 941 So. 2d 35. The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). Louisiana appellate courts have repeatedly rejected the argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution. *State v. Parker*, 416 So. 2d 545 (La. 1982); *State v. Cannon*, *supra*; *State v. Smith*, 49,839 (La. App. 2 Cir. 5/20/15), 166 So. 3d 416, *writ denied,* 15-1244 (La. 6/3/16), 192 So. 3d 753.

To rebut the presumption that the mandatory minimum sentence is constitutional and receive a downward departure in sentencing, a defendant must clearly and convincingly show that he is exceptional, which means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So. 2d 672; *State v. Cannon*, *supra*.

The Legislature's determination of an appropriate minimum sentence should be afforded great deference by the judiciary. The rare circumstances in which a mandatory minimum sentence is unconstitutionally excessive are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as first degree rape or second degree murder. *State v. Cannon*, *supra*; *State v. York*, 48,230 (La. App. 2 Cir. 8/7/13), 121 So. 3d 1226, *writ denied*, 13-2154 (La. 3/21/14), 135 So. 3d 617.

We find the mandatory sentence of life imprisonment for the conviction of second degree murder is presumed constitutional, and defendant has failed to demonstrate that he is an exceptional defendant for whom a downward departure from the statutory minimum is required. Defendant's sentence is not disproportionate to the seriousness of the offense and is not a needless infliction of pain and suffering. Therefore, the mandatory sentence imposed for second degree murder, life without the benefit of probation, parole, or suspension of sentence, was not constitutionally excessive for this offense or this offender.

Further, prior to imposing the 40-year sentences for the attempted second degree murder convictions, the trial court considered the factors set forth in La. C. Cr. P. art. 894.1. The trial court noted that defendant "opened fire with an AR pistol at a large group of people on a street in downtown just a few feet from a crowded nightclub." The court found defendant's actions manifested deliberate cruelty to the victims, and his actions created a risk of death or great bodily harm to more than one person because he "pointed a gun and fired multiple shots at a group of at least seven people, killing one and seriously wounding six others." The court also stated, "We have a victim that died[.] *** You have six other people that got shot, that caused pain, anguish, and, as stated, economic hardship to their families." Moreover, the trial court noted defendant used a dangerous weapon, "an automatic AR-styled pistol, which is effectively a rifle," during the commission of the offenses, and he foreseeably endangered human life by discharging the firearm into the crowd. We find the trial court did not abuse its discretion in imposing 40-year sentences for the attempted second degree murder convictions.

The court also sentenced defendant to serve the maximum sentence of five years for aggravated flight from an officer. As the trial court stated, "[Defendant] fled from law enforcement through residential neighborhoods, exceeding 100 miles per hour, blowing through red lights, stop signs, and driving through back yards[.]" Defendant placed numerous lives, including innocent lives members of the general public and law enforcement officers, in danger in his attempts to evade police officers. Though the sentence imposed for this offense was the maximum sentence, it falls within the sentencing range. We see no abuse of the trial court's great discretion.

## CONCLUSION

For the reasons set forth herein, we affirm defendant's convictions and sentences.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED.**